**THE SANDGATE CASTLE.**

Petition of **UNION CASTLE MAIL S. S. CO., Limited.**

No. 1074.

District Court, S. D. New York.
Nov. 24, 1939.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (James H. Herbert, of New York City, of counsel), for petitioner.

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley and F. Herbert Prem, both of New York City, of counsel), for claimants.

HULBERT, District Judge.

The Steamship Sandgate Castle, having taken on board a general cargo for carriage to African ports, sailed from New York on June 23, 1937, and three days later was destroyed by fire about 600 miles at sea.

There was no loss of life.

On December 16, 1937, the Union Castle Mail Steamship Company, Ltd., a British corporation which owned and operated said vessel, filed a petition for exoneration from or limitation of liability pursuant to the provisions of Title 46 U.S.C.A. §. 182 (known as the Fire Statute) and Section 183 (known as the Limitation Statute) respectively.

The cargo claimants filed answers to the petition and the trial of the issues thus raised were tried before me.

It was stipulated for the purposes of the trial, that claimants have the legal status alleged in the respective claims filed with the Commissioner appointed by the Court; that all of the cargo described in such claims was stowed aboard the Sandgate Castle and became a total loss June 26, 1937; that all of the cargo was owned as alleged in the respective claims and that all of the shipments in relation to which claims have been filed in the name of insurance companies, were insured as alleged in the respective claims and the insurance company claimants being liable so to do, subsequently paid losses to the respective cargo owners in the amounts alleged in the re-

spective claims and secured assignments from the respective cargo owners.

It is the settled law in this case that cargo-claimant has the burden of establishing that the fire resulted from the vessel owner's design or neglect. Sandgate Castle, 1938 [1].

The master, other officers and crew, of whom only the chief and fourth assistant engineer and donkeyman had seen previous service upon the Sandgate Castle, were rescued and brought to New York by the Steamship "President Pierce."

Shortly thereafter they were interviewed by the proctors for the petitioner and their statements taken before a notary public. Upon their return to England there were investigations by the petitioner, the Wreck Commissioner (a public official) and the British Board of Trade.

Upon this trial, which occupied two months, it was brought out that some of these witnesses had made conflicting statements in their testimony on one or more previous occasions. Exhaustive briefs were exchanged, replied to, respectively, and submitted, in which the facts were reviewed in great detail. Nevertheless, with the model of the vessel, received in evidence, in my mind, and the plans, charts, photos, repair bills, letters, cables, log books, protest of the master, and other exhibits at hand for convenient reference, I have read, and in many instances re-read, the testimony, tracing the course on the ship of every witness who had any knowledge of the four fires which took place on the morning of the disaster, noting his observations and his comments and checked the same with the testimony of the others, and then reviewed the course of events on the previous voyage, the condition of the vessel upon her arrival in London, the repairs made there and at Hull with relation to the recommendations submitted by the chief engineer, as well as in Philadelphia and New York.

Few men have the time to be brief and this opinion would be unduly prolix if it attempted to review the conflicting evidence, or even detail the facts as I have determined them in my own mind in arriving at my decision.

The proof satisfies me that a quantity of oil in excess of 70 gallons overflowed when the manhole cover was off the top of the port settling tank; that some of that oil came in contact with the boilers and steam pipes resulting in a fire of at least 15 minutes' duration in the settling tank space which was of sufficient intensity to ignite a highly inflammable and readily combustible cargo stored in the 3-A compartment of the shelter deck, separated from the starboard settling tank by a ⅜th inch steel casing.

Within an hour this fire had spread over the ship and inability to control it compelled the abandonment of the vessel.

It has also been established to my satisfaction that when the Sandgate Castle arrived in London, April 24, 1937, from her previous voyage, she was unseaworthy.

Mr. Gray, who, in effect, had the status of the petitioner, conceded that the voyage had been unsatisfactory and petitioner did not want it repeated. He instructed one of his London assistants, Mr. Imray, that all of the defects must be put right before she sailed again. The vessel was to discharge cargo partly in London and finish in Hull, which, he said, made a good opportunity for personal observation on the run from London to Hull and Mr. Imray was instructed to go in the ship and carry out any further work necessary in his opinion.

The captain admitted the vessel had hurried her departure from Hull to be on her berth in New York to sail as advertised, and as the chief engineer testified "with a good bit of work unfinished," which, however, he said "was not important."

The evidence is very clear that the Pneumercator gauge on the settling tanks, which had been out of order, and its use discontinued, on the previous voyage, was not repaired, as well as leaks in the oil storage tanks. Consequently, the ship had not been made seaworthy, at least in those respects, before sailing from Hull. Petitioner's own witness, Chalmers, for 32 years connected with Lloyd's emphasized the danger of leakage of oil from settling tanks, or any other part of the ship and getting into its structure.

My conclusion is, that such neglect on the part of the owners of the vessel was the proximate cause of the fire which resulted in her loss.

"A carrier who chooses for his own purposes to send out a crippled ship with needless enlargement of the perils of navi-

---

[1] No opinion for publication.

gation will not receive exemption at the cost of the owners of the cargo if the perils thus enlarged have brought the ship upon the sands." May et al. v. Hamburg, etc. (The Isis), 290 U.S. 333, 54 S.Ct. 162, 166, 78 L.Ed. 348.

A stronger factual situation was established here than in The Doris Kellogg, D.C. S.D.N.Y., 18 F.Supp. 159, 1937 A.M.C. 254, decided by my colleague, Judge Goddard, whose decree was affirmed without opinion, 2 Cir., 94 F.2d 1015.

The petition must be denied.

Submit findings of fact and conclusions of law on notice.