HOSKYN & CO., Inc., et al. v. SILVER LINE, LIMITED.

District Court, S. D. New York.

Jan. 11, 1943.

Supplemental Opinion March 25, 1943.

owners or underwriters of cargo which the M/V Silvercypress was transporting from United States ports to the Far East.

The vessel, which was owned by and operated for the account of respondent, sailed from New York on November 24, 1936 on a voyage to Hong Kong and return, lading cargo enroute at Baltimore, Norfolk, Newport News and Savannah, proceeding thence through the Panama Canal to San Pedro (Los Angeles) arriving at Manila, January 8, 1937.

After discharging a portion of her cargo there, she brought up in the Harbor of Ilo Ilo, P.I. in the afternoon of January 12th and, immediately after anchoring, resumed discharging cargo. About 3:45 a.m. on January 13, 1937, a fire broke out in the engine room and spread so rapidly that the vessel was beached and the fire was not extinguished until a week later.

The cargo, however, was not a total loss.

Recovery is sought for loss of, or damage to, the cargo as a result of the fire or from the efforts made to extinguish it. In addition, libelants, in some instances, seek to recover cash deposits, amounting to approximately $125,000 required by the respondent as security for general average contribution, the disposition of which is awaiting the outcome of this litigation; also to recover payments made as second freight for the on-carriage of certain goods to final destination, respondent contending that the fire terminated the contract therefor; and, lastly, damages sustained by the over-carriage of three shipments to Ilo Ilo consigned to Manila and destroyed in the fire, which libelants assert constitutes a deviation.

The respondent answering the libels, denied all liability and set up, among other defenses, the following provision of the bills of lading under which all cargo was accepted for transportation "This shipment is subject to the provision of Section 4282 of the Revised Statutes of the United States", 46 U.S.C.A. § 182, known as the "Fire Statute" which reads as follows: "No owner of any vessel shall be liable to answer for or make good to any person any loss or damage, which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner."

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley and Charles W. Harvey, both of New York City, of counsel), for libelants.

Lord, Day & Lord, of New York City (Thomas F. Daly and Charles W. Merritt, both of New York City, of counsel), for respondent.

HULBERT, District Judge.

In Admiralty. Eighteen separate libels, in personam, were filed in this court by

This is not a statute of limitation but of exoneration (The Cabo Hatteras, D.C., 5 F.Supp. 725, 729) and relieves the owner from liability unless libelants prove such fire was caused by the "design or neglect" of the owner. The Sandgate Castle, D.C., 30 F.Supp. 344.

These suits were, by order dated December 19, 1940, consolidated for the purpose of trial, under the title "Hoskyn & Co., Inc., et al. v. Silver Line, Ltd.," but before trial, counsel had selected four cases as typical, and stipulated that the decision as to the cause of, and liability for, the fire in those four cases would control the disposition of the other 14 cases, upon that issue, reserving, however, the submission of proof upon the remaining issues for determination by a commissioner.

The M/V Silvercypress was one of a fleet of vessels owned and operated by the respondent, under the management of Stanley & John Thompson, Ltd., of London, and was one of four ships of the same class, all constructed by Harland & Wolff of Belfast, Ireland, and was built in 1930. She was 470 feet in length; 62 feet abeam; a combined passenger and freight vessel, having three cargo compartments forward and three cargo compartments aft, respectively, of the engine room, and, in addition to her double bottom tanks, had forepeak and afterpeak tanks.

The main propelling machinery consisted of two 6-cylinder 4-cycle blast injection Burmeister & Wain type Diesel engines, manufactured by Harland & Wolff. Virtually all of the auxiliary machinery of the vessel, including all pumps and winches, as well as the galley stoves and lights, were powered by electricity, which was supplied by 4 Diesel generator units of the Burmeister & Wain type, and manufactured by Harland & Wolff. No. 1 and No. 2 units were forward and aft on the starboard side, and No. 3 and No. 4 units forward and aft on the port side, respectively, of the engine room. Each unit consisted of a Diesel engine and generator.

The Diesel engines were of the 6-cylinder 4-cycle solid injection type, rated at 150 h. p. each and designed to be operated at 300 r.p.m., at which speed they produced electricity through the generators at 220 volts, and each unit, normally, was capable of carrying a load of 450 amperes.

A Diesel engine is too intricate to describe in a few words. It was rather succinctly stated by one of the witnesses for the respondent, Kates: "A Diesel engine has got a big job on its hands. It has to take fuel at one end, burn it, produce hot gases, convert those hot gases into mechanical work. In other words, it takes the place of a boiler and a steam engine in a steam power plant. So it has got a big job on its hands, and many things go wrong with it."

The respondent's advocate, in his brief, quoted from a text book of which Mr. Ford, the author, was cross examined at length with respect thereto: "Perhaps the most striking difference in the problem of maintenance of the Diesel engine as compared to steam engine maintenance arises from the fact that the steam engine can be allowed to fall, more or less gradually, into a very bad state of disrepair and will continue to run but the Diesel engine must be pretty nearly right or it will not run at all. The steam engine that is not kept in good repair indicates it's condition by a falling off in power and increased consumption of fuel. If the maintenance requirements of the Diesel engine are neglected, the usual result is that it will stop and sometimes this stoppage will come with so little warning as to result in the ship being caught in a very dangerous situation."

The Silver Line ships made voyages carrying cargo and passengers from United States ports to the Far East either by way of the Cape of Good Hope, Beira, Hong Kong, Manila, Java ports, Singapore, and back the same way, touching at Colombo, Halifax and Boston, or through the Panama Canal, thence across the Pacific, returning via the Suez Canal and the Atlantic Ocean. Each voyage required about 4½ months.

Pursuant to an order of discovery a large number of documents were produced from the files of the respondent which, as stated in respondent's brief "have been introduced and offered in evidence by both sides."

There were also interrogatories propounded, from which it appears Stanley & John Thompson, Ltd., were, by the terms of their employment, required to: "Devote their best interests to the services of the Company. They shall act as ships' husbands for the vessels belonging to the Company, and shall decide upon the nature and terms of the employment and insurance of all vessels owned or chartered by the Com-

pany, and shall discharge all such duties in connection with the said vessels as are usually discharged by ships' husbands and ships' Managers, including the appointment and discharge of clerks and all Surveyors, Inspecting and Consulting Engineers, Superintendents, Masters, Officers and Crew, *affecting repairs* and outfit of vessels, etc.," (Italics supplied.)

No Superintendent Engineer was employed by either the respondent or its Managers at their respective head offices. Matters of a technical nature, as to hull, were attended to by the Company's Marine Superintendent, Captain H. F. Boler, and as to machinery, by a member of their permanent staff, Mr. H. M. Sullivan

"who deals with all information received from ships' Engineers and Superintendents abroad so as to enable the Managers to give the necessary instructions and make the necessary provisions guided by advice sought and received from the respective Engine Builders of the various types of machinery installed in Silver Line, Limited, vessels * * *"

"In addition the services of Mr. R. C. Thompson, Managing Director of Messrs. Joseph L. Thompson & Sons, Ltd., Shipbuilders, Sinderland, are, by arrangement, at the disposal of the Managers on all matters relating to the maintenance, upkeep and general running of the Company's vessels."

The respondent, however, employed Superintendent Engineers, or Port Engineers—

Mr. H. E. Cropley     at New York
Mr. E. Stephenson     at Hong Kong
Mr. B. Hardy     at Calcutta

Their duties were "to insure that the Company's vessels, including the machinery, are maintained in the highest state of efficiency and to deal with, and have executed, all repairs and renewals which are necessary. They are not restricted in any way whatever as to the amount of expenditure which may be incurred in maintaining the Company's vessels in the highest standard of efficiency. Their authority, however, is limited in that they have no authority to make any structural alterations or any basis alteration in design, without reference to the Managers' Head Office in London."

Repairs were preferentially made at Hong Kong.

With respect to the engine room, the rules and regulations established by the respondent required that: "the Chief Engineer of each vessel of the Company each voyage to complete a printed form showing detailed particulars of the condition of all machinery items (main and auxiliary). One copy of this report is mailed to Head Office in London, one to the New York Office and one to the Terminal Port in the Far East concerned with the particular vessel's upkeep."

It was also: "the duty of each Superintendent Engineer to complete and dispatch to London Office a full report detailing particulars of the condition of each vessel, together with full information of all repairs and renewals effected. * * * The reports are mailed to London Office as soon as possible after the sailing of each vessel and in addition copies of each Superintendent's reports are exchanged between every Superintendent of the Company.

When the Silvercypress sailed from New York on the current voyage (designated as No. 17) the engine room personnel consisted of:

| | |
|---|---|
| Chief Engineer | Sanderson |
| Second Engineer | Matfin |
| Sr. Third Engineer | Millan |
| Third Engineer | Carson |
| Jr. Third Engineer | Hewitt |
| Sr. Fourth Engineer | Ingram |
| Fourth Engineer | Trenouth |
| Jr. Fourth Engineer | ——— |
| Fifth Engineer | Duffy |
| Ass't Engineer | Camblin |
| Ass't Engineer | ——— |
| Electrician | Stokeld |

Hewitt deserted the vessel at San Pedro.

Four members of the engine room personnel were "certified engineers"; the British Board of Trade required two.

The *libelants called only one factual witness,* Charles Yeats Ingram, Third Engineer, whose probity is vigorously challenged by the respondent, *and one expert,* Louis R. Ford.

Ingram was the only person aboard the vessel who sustained injuries occasioned by the fire. He was badly burned and was taken to a hospital in Ilo Ilo where he remained a patient for 6½ weeks.

During that period he was interviewed by Edward Stephenson, who had come on from Hong Kong, and Ingram later signed

a typewritten statement prepared by, or at Stephenson's direction. (Exhibit A.)

Ingram also wrote a detailed statement, while in the hospital, at a time when his hands were still bandaged (Exhibit 20). As soon as he was able to travel, and arrangements could be made for his transportation, he was sent home and arrived in England on April 28, 1937. He was interviewed by representatives of the respondent and then taken to the office of the Receiver of Wrecks and there made a sworn statement (Exhibit J). Thereafter, Ingram presented a claim in writing, dated May 6, 1937 (Exhibit K), to the Shipping Federation, Ltd. Subsequently, Ingram received from Thompson 60 pounds for loss of gear and a bonus of 50 pounds.

On May 14, 1937 the Shipping Federation fixed the amount of compensation to be paid him at 30 shillings per week from April 28th, the date of his arrival in England, until he was able to return to duty. This incurred his displeasure and he wrote the Receiver of Wrecks May 17, 1937 (Exhibit 19) giving, in greater detail, his version of the fire, and its cause, and also asserted a claim, in a communication to Thompson dated May 21, 1937 (Exhibit F) for his loss of wages, from the date of the fire to April 28th, and 150 pounds for "burns, shock and scars left."

An examination of the extensive correspondence, which passed between Ingram and Thompson, reveals that after the final adjustment of his claim he concluded he had not been fairly dealt with.

Almost a year later, April 26, 1938, Ingram wrote Thompson. "Regarding your requests I am sorry but I feel I cannot assist the Silver line any more." (Exhibit Y.)

About that time Ingram made a statement to a representative of Godfrey Warr & Co., British Solicitors, acting for the libelants. (Exhibit 21.) Subsequently a representative of the respondent, or its insurers, interviewed Ingram. He then admitted that he had been embittered and actuated by a spirit of revenge, but had relented, and exonerated Thompson, holding the Shipping Federation responsible for his plight. He expressed a willingness to again come under the banner of the respondent and carry out its orders if he received 1000 pounds to compensate him for his injuries. This offer was not accepted. Eventually Ingram came to the United States, his

deposition was taken by libelants and read at the trial. All of the written statements made by Ingram, offered in evidence, were received for the purpose of enabling the court to determine, by comparison, the weight to be given to his deposition. Libelants assert, however, their case is complete without relying upon his testimony.

The respondent presented the depositions of Captain Smith, Master, Trenouth (4th engineer), Camblin (an assistant engineer, unrated at the time of the fire), and called as witnesses, Matfin (2nd engineer), Cropley and Stephenson, Superintendent Engineers at New York and Hong Kong, respectively, Hamp, described by the Master as the "owner's Managing Director at New York" and three experts, Morton Arendt, Edward J. Kates and Soren Martin Petersen.

"To stick by the ship" is an inclination of mariners. It has been said that it is unfortunately "too often true of sailors, that they place a higher value on fidelity to their vessel than upon fidelity to truth, and esteem their allegiance more sacred than their oath * * *." The Manitoba, 16 Fed.Cas. pages 620, 624, No. 9,029.

Judge Woolsey said, in Hazeltine Corp. v. Radio Corporation of America, D.C., 52 F.2d 504, at page 510, concerning a sea captain whom he once examined: "When faced with an apparent discrepancy between letters which he had written and the evidence which he was then giving, he said to his cross-examiner, in explanation: 'In this world, a man always has to exaggerate and unexaggerate according to circumstances.'"

Captain Smith disclaimed any knowledge of the engine room, which he asserted was a separate department whose chief did not report to him. Nevertheless, every communication addressed by Sanderson to the Managing Agents was countersigned by the Master as well as requests for shore repairs. Matfin's testimony is a myriad of conjectures and a labyrinth of contradictions. Trenouth, who sailed on voyage 16, as well as the subsequent fatal voyage, never saw or heard of a governor handle having been tied back on the Silvercypress, although it was conceded to have occurred.

Camblin, who was making his first sea voyage, at least as an engineer, found everything, "the auxiliaries and everything about the engine room" normal or "as usual".

Respondent sought to introduce depositions of Sanderson, Chief Engineer, and Millan, Sr. Third Engineer, taken by libelants Oct. 6, 1937 in another case arising out of this fire in which the libel was filed before the institution of the pending suits. They were excluded.

Sanderson left the employ of the respondent upon his return to England in January, 1938. Cropley saw him in Manila in August, 1941, at which time he was acting in the capacity of a non-exclusive Surveyor for Lloyds.

On January 21, 1941, Thompson furnished the addresses of Millan, Carson and Stokeld, as well as Trenouth and Camblin, to Hamp at New York.

No application was ever made for a commission to take the deposition of any of them except Trenouth and Camblin. Respondent asserts the testimony of Carson and Stockeld would only be cumulative.

The testimony of Duffy, 5th engineer, who preceded Camblin on watch before the fire, would undoubtedly have been informative and helpful to the court but, according to the communication of January 21, 1941, his whereabouts could not be ascertained.

It does appear that a postponement of this case was once had to enable respondent to apply for a commission to examine Sanderson in Manila, but nothing further was ever done about it.

However, since libelants were apprised (but before there had been any discovery or production of the records of the Silvercypress, her owners and operators) to the extent of their depositions in the Fagan case, of the nature of the testimony Sanderson and Millan might be expected to give, and libelants could themselves have moved to take the depositions of those witnesses, I shall follow the rule laid down in Hayden v. New York Rys. Co., 233 N.Y. 34–37, 134 N.E. 826, and not draw any unfavorable inferences from the failure of the respondents to adduce their testimony. Cf. The Cananova, D.C., 297 F. 658, 662, 1924 A.M.C. 877.

According to Camblin, the fire started about 3:45 a.m. He was working at a bench between the two main engines when he heard a popping or lifting of a safety valve and he left his position at the work bench and went around and saw sparks coming out of the No. 2 cylinder of No. 2 generator. The next thing he observed "she burst into flames" and then Ingram came down into the engine room from the starboard side (forward) and said "Shut her down." At that time both were standing at the aft end of the No. 2 auxiliary engine. Camblin then stated he went to the generator and lifted the governor handle; whereupon he was directed by Ingram to "get some fire extinguishers" and proceeded between the No. 1 and No. 2 generators and the starboard main engine to the forward end of the engine room; and, making three trips, secured three foam type extinguishers and handed them to Ingram, who was at the forward end of the generator. While obtaining the extinguishers, he testified Ingram was trying to shut off the valve at the forward end of the generator to stop the flow of oil into the pipe but he was unable to do so because the valve was too hot. Ingram then told him to call the engineers and he went on deck to do so.

Ingram testified he was in his cabin writing letters when he heard a distinct knocking in the engine room and hurried below, met Camblin and proceeded to the starboard side of the No. 2 auxiliary engine and saw sparks being shot from the relief valves of No. 2 and No. 3 cylinders. When he told Camblin to shut the engine down he ran up the ladder to the switchboard to throw the load from No. 2 to No. 1 auxiliary and when he had signaled to Camblin that he had done so, he ran down the ladder and found Camblin trying to pull back the governor handle of the No. 2 generator which, according to Ingram, was held fast by a piece of tarry string, causing the engine to race and vibrate. Ingram says he then ran to the forward end of No. 2 generator to stop the engine by turning the fuel valve and cut off the supply of oil, when, he asserts, his attention was attracted to an accumulation of fuel oil glistening on the floor plates outboard of No. 2 engine. Almost immediately there was a burst of flames at his feet. He jumped back from the flames and fell against Camblin, who was back of him, as the fire roared up behind the No. 2 engine.

According to Ingram's version, that was the time when the extinguishers were obtained and he attempted to play their chemical contents onto the fire between the two engines. The starboard bilge then caught fire just aft of the point where he had first seen the flames at his feet and he told Camblin to go on deck and give the alarm.

Ingram then ran up the ladder to shut off the valve on the starboard fuel oil tank, but was unable to do so as the flames had already reached there. His progress up another ladder to the alleyway was cut off by the wall of fire, and after falling over a railing upon a settling tank, he crossed to the port side of the engine room to which the flames had then extended, and proceeded through the flames on deck and was thereafter taken ashore, and to a hospital, to be treated for the burns he had received.

Camblin testified that prior to the time the fire started everything was normal in the engine room so far as he knew. He denied that the generator governor handle was tied back or that he had ever known it to be tied; that the tank tops in the engine room were in good condition, free of oil; that the floor plates had been cleaned by the greasers on each watch and were "polished clean"; that the bilges were clean and free from oil and sand boxes filled at the time of the fire; (the proof is that the sand for the sand boxes had, through inadvertence, been left on the dock at New York) that the fire fighting equipment on board the vessel was in good condition so far as he knew. When he heard the popping of the safety valve he realized there must be something abnormal in connection with either No. 1 or No. 2 generator then in operation. He did not know what caused the fire, but expressed the opinion that the fuel pipe burst and the relief valve lifting —the sparks emitted therefrom ignited the fuel. But as he walked aft of the starboard main engine to the after end of No. 2 generator, no oil sprayed upon him from above.

The actual cause of the fire is a matter of conjecture. The libelants contend, however, that the vessel was unseaworthy throughout the preceding voyage (No. 16) and the fatal voyage (No. 17) up to the time of the fire; that the owner through its Managing Agents Stanley & John Thompson, and Superintendent Engineers Stephenson at Hong Kong and Cropley at New York, had knowledge of the unseaworthy condition of the vessel and was under a duty to remedy such conditions, and by reason of its failure and neglect to do so, should be held responsible for the resulting damage.

The immediate cause of the libellants' loss was the fire, and the question presented upon this record is, whether there is a causal connection between the origin of the fire and the unseaworthiness of the vessel.

When the Silvercypress sailed from New York (on voyage 16) July 1, 1936 for the Orient, by way of Cape of Good Hope and return, Sanderson had taken over as Chief Engineer with practically a new staff in the engine room. Before the vessel sailed the three East Indian greasers (who served as oilers and wipers) deserted the ship and the engine room was not normally ship-shape as to cleanliness. There was no replacement of those Lascars until the vessel arrived at Singapore and it was, therefore, necessary to establish "field days" for the engineers, which meant that overtime periods were assigned to them in addition to their regular watches.

The proof is that 3 generators were required approaching and leaving port and, while loading and discharging cargo in port, because of the extra power needed for the anchors and winches, but that 2 generators were sufficient at sea, and one might suffice if normally producing 450 amperes. Matfin, however, testified that because of the age of the vessel (6 years) the capacity was diminished to 400-420 amperes, and the record indicates it was, at times, even less.

Before the vessel sailed from New York, a bottom end bearing in each of the No. 1 and No. 2 generators ran the white metal. This was due to insufficient lubrication. The bearings were taken ashore and re-metaled, but there was not time enough to machine them. It was customary, however, to do this on the vessel.

Meanwhile, No. 2 generator was operated on 5 cylinders. The No. 3 generator, which had been repaired at New York, and the No. 4 generator were also available, but the ship had hardly left the harbor when the No. 2 and No. 3 generators failed, and No. 4 was unable to carry the load. The No. 2 generator had run the white metal in another bottom end bearing; likewise No. 3 generator; in addition to which the latter was found to have camshaft chain broken, camshaft badly bent at the governor end and a small crack was located in its No. 1 cylinder.

The Chief Engineer was of the opinion that when the governor shaft and bearings of No. 3 were reconditioned in New York sufficient slackness was not provided to allow for distortion of the sprocket wheel resulting in the gradual overheating and seizure of the governor bearings and caus-

ing the chain to break and the camshaft to bend. But respondent's expert, Petersen, testified the governor had nothing to do with the bending of the camshaft and there must have been some stress on the engine doing work it was not designed to do. The machine was repaired, as far as possible, the governor disconnected away from the bent camshaft and the governor handle was tied back, with a piece of string, until Matfin could make and substitute a quadrant, and, by maintaining a steady load, the No. 3 generator functioned fairly well to Capetown where the bent camshaft was straightened, the distorted end of the shaft and keyway built up with welding, keyway recut and the old gear wheel refitted. Material was also purchased at Capetown to "turn two shafts" one of which "was required for No. 4 generator" as soon as "it could be made."

On July 6, 1936, No. 4 generator caught fire, in the way of the exhaust trunk and the back of the cylinder, due to a leakage of fuel oil from a fractured by-pass valve on No. 4 cylinder, spraying oil onto an overheated exhaust manifold. The flames were two or three feet high; four extinguishers were used and the fire put out.

Matfin testified that an entry in the log, of repairs to the No. 4 generator on that day, "was just a coincidence."

July 13, the exhaust valve of the No. 3 cylinder of No. 2 generator burned through, the mushroom head fell into the cylinder and caused the inlet valve body to be broken.

July 22d No. 2 generator was only taking a light load. On checking the timings they were found to be late to the extent of 23°. The camshaft drive was examined and the camshaft sprocket wheel found to be slack at the end of the shaft .020 degrees; the key and keyway each worn 1/8 of an inch, giving a total slackness of 1/4 inch. A temporary repair was effected by driving in a tin liner. Difficulty was then experienced in getting correct timing owing to camshaft chain being stretched. This was also true on generators No. 3 and No. 4.

The Chief Engineer reported "it will be necessary to have the worn camshaft built up by welding at Capetown." It was never done up to the time of the fire.

Meanwhile, on the morning of July 20, the Silvercypress overtook her sister slip, the "Silverbeech" disabled with a broken crankshaft, and towed her, by winches and anchor chains, into Capetown, a distance of about 1600 miles; on those dates the Chief Engineer's log book records:

July 20; light winds, light sea
used gens No. 1– 7 hrs
3–24 "
4–23 "

(It will be noted that on this and subsequent days the No. 3 generator was operating with the governor disconnected).

July 22—Moderate falling wind and sea

On this date only generators No. 3 and No. 4 were used 24 hours each.

July 23rd; Strong wind, rough sea, heavy swell, rolling and pitching heavily; used gens. No. 2– 1 hr
3–24 hrs
4–23 "

July 24; Started pumping fuel oil overboard at 9:30 a.m. to smooth the seas and improve steering condition for both vessels. Whole gale; High sea and heavy swell; Rolling and Laboring Heavily; used gens. No. 3–24 hrs
4–24 "

July 25: Discontinued pumping fuel overboard at Midnight. 13.80 tons fuel oil used. Mod. Gale; High Sea and Heavy Swell, Rolling and Laboring Heavily; used gens. No. 3–24 hrs
4–24 "

and stopped starboard engine at 6:33 p.m. and reduced speed awaiting daylight.

July 26: Mod.Gale, High seas and Heavy Swell; used Tow rope cast adrift gens: No. 2–21 hrs. at 8:08 A.M. vessel
3–22 " alongside and finished
4–12 " with engines 9:47 A. M.

July 27—At Capetown—used No. 2 gen. 24 hrs. and No. 4–4 hrs. Generator and camshaft, etc., of No. 3 sent ashore and repaired and returned.

July 28: Vessel sailed—used gens: No. 2–23 hrs
3– 2 "
4–14 "

From Capetown the Chief Engineer mailed letters to the Managing Agents, received by them on August 13, reviewing the foregoing conditions in considerable detail, and said:

"Having so much work to do on generators we were very fortunate there was no refrig. cargo on board. During the tow-

ing of the Silverbeech it was a very anxious time, and a strenuous one for everybody, to keep going without stopping the engines.

\* \* \* \* \* \*

"I would like to advise you on the lub. oil in the M.E.System. Since leaving the U.S. the lub. oil purifier has been kept running constantly with the exception of the time taken for cleaning, which has to be done every 60 minutes. The residue from the bowl alone averages from 40–50 lbs. per watch, 240–270 lbs. per day. No account was taken of water and sludge from the discharge side of the purifier. While the vessel has been under weight it was seen that water was dripping constantly from the perforated ends of the vent pipes on deck (2 port. 2 star.) leading from the D.B.lub sumps; this can only be condensate from water in the lub. oil. There has been a steady drop in the soundings of the lub. oil sumps and I anticipate a big 'shortage.' A very careful survey has been made for leakages but up to the present I have not been able to investigate the E.R.Tank Top owing to the amount of sludge and dirt there. I will suggest to Mr. Stephenson to have this cleaned with shore labor in Hong Kong."

These letters gave the owners notice of serious existing defects which certainly required specific attention by their accredited representative in Hong Kong, and the indifference and inattention of Stephenson and Cropley, is incredible.

Meanwhile, on July 29, 1936, the Managing Owners, wrote Stephenson there would be no time for the Silvercypress to make a call at Hong Kong and directed him to proceed to Manila where any necessary overhaul work would be put in hand, observing, that they did not anticipate anything of a major nature, and in view of the high cost of shore labor at Manila, he should ask the Chief Engineer to utilize his own staff to the utmost but "in any case sufficient work to be done to insure the efficiency of the machinery and the hull until the return to Hong Kong on the subsequent voyage."

Mr. Hamp when notified, by cable, of this change in itinerary wrote the Managing Agents from New York on July 30, 1936: "I recommend that *you should arrange for Mr. Stephenson to proceed to Manila to meet this vessel and supervise the overhauling, as I think it is important that he should be there in order to take special care of vessel's generators* and there are also a few other items which should also receive Mr. Stephenson's attention." (Italics mine.)

However, the Master, having advised the Managing Agents that he could arrive in Hong Kong on or before August 22nd, was directed to do so and Stephenson's orders to proceed to Manila were cancelled.

On the leg of the voyage from Capetown to Hong Kong, the Chief Engineer's log book contains almost daily entries, as it did from New York to Capetown "overhauls and adjustments" and "repairs" to generators, without specification of the particular nature thereof, except, that No. 1 auxiliary engine was completely overhauled, and, for the first time since leaving New York, put into service on the date of arrival in Hong Kong, and a new governor had been fashioned out of material purchased at Capetown for the No. 4 generator.

But, when the Silvercypress arrived in Hong Kong Stephenson was absent; he had gone to Singapore at the direction of the respondent. Substantially all of the repairs listed by the Chief Engineer were made except only the broken piston rings which were *replaced with ship's spares.*

The vessel sailed from Hong Kong on August 27, 3 days ahead of schedule, to arrive at Manila, a distance of 600 miles and about two days sailing, in time to take on cargo, and issue bills of lading with August dating, a financial arrangement with the bankers which Stephenson did not understand. He arrived from Singapore three hours before the ship sailed. He made no inspection of the vessel or the log books, and was only able to go over the repair list with the Chief Engineer casually, because of the limited time.

The following is characteristic of his attitude:

"Q. Mr. Stephenson, in going over the repair list with the chief engineer, did you note that he had an item down here 'Generator fuel pipes to repair and test four thousand pounds' A. I would not take much notice of that at all.

"Q. 'Generator drainpipes to repair, generator by-pass valves to repair and test'; do you recall those items?

\* \* \* \* \* \*

"A. No, we did not want to hold a post mortem. It was time for the ship to sail. We wanted to be constructive in whatever we did and not waste time on something that had gone over the dam.

"Q. Timing is most important in relation to auxiliary engines? A. Oh, quite. We generally check the timing once in a while."

There are other comparable instances.

The Chief Engineer reported he had a shortage of lubricating oil on the run to Hong Kong, but "it was not a very serious matter" to Stephenson, although he had received at least one letter from the Owners complaining about the amount of lubricating oil that was being used on the Silvercypress. He said: "they were shouting up the wrong alley. There was no loss of lubricating oil."

There is no doubt that Stephenson relied upon the ship's officers with respect to the condition of the vessel. He testified that the Chief Engineer "felt o.k. and was ready to sail it" and the Captain and Chief Officer were also satisfied.

However, in a report which Mr. Stephenson sent to London after the Silvercypress had sailed from Hong Kong, he said:

"Coming out via the Cape, it was evident that the overhaul period, if any, at Hongkong would be short. It was further curtailed by the necessity of having to sail the vessel a.m. August 27th instead of the schedule date of August 30th in order to take August loading at Manila.

"We were absent from Hongkong when the vessel arrived. * * * but prior to leaving Hongkong we made general arrangements for tank cleaning and repairs to be taken care of and the programme worked out as well as time and circumstances would allow.

*    *    *    *    *    *

"A good bit of work was necessary with respect to repair and the provision of a sufficient supply of spare parts for those machines, chiefly gudgeon pins and brasses and exhaust valve spindles. It was necessary to repair as new 49 valve spindles, notwithstanding that 38 were renewed last voyage. The Chief Engineer advises us that some of the machines (one or more) were badly out as regards timing when he came to check up, which no doubt accounts for the large number of burnt valves. The timing has since been corrected, and better results obtained."

Mr. Stephenson was interrogated at great length regarding this report and testified that he had to send a bill to his Owners for these repairs which were carried out in his absence and had to justify some reason for reconditioning 49 more spindles.

"Q. Do I understand from your testimony that Mr. Robson did something with respect to those 49 in your absence which you would not have done if you had been there? A. That is what I believe to be the case.

"Q. And in writing to your owners you did not want to disclose that Mr. Robson had done something that you would not have done if you had been present? A. That is so. It is possible the owners would start writing a chain of letters to me to find out why we were doing all this work.

"Q. Then you did not think Robson did the job as well as if you had been in Hongkong? A. I do not know. He would more likely take exactly what the chief asked him to do. He would not criticize the chief's repair list as I would."

In view of the disposition to be made of this case, it seems unnecessary to unduly extend this already too lengthy opinion with a detailed statement of mishaps aboard the vessel; suffice it to say, that from Hong Kong to Singapore, similar entries were made in the log book regarding "overhauls and adjustments" and "repairs" to generators.

While the new shaft for No. 4 generator was taken ashore at Hong Kong and drilled, and the pistons were removed for repair and adjustment of bottom end bearings, and the No. 4 generator head valves fitted and machine tested o.k., according to the log, the No. 4 generator was still under repair for 10 days after leaving Hong Kong and operated only 7 hours during that period. The No. 1 generator, from which the 3, 4 and 5 pistons had been removed at Hong Kong for repair, was inoperative for about 25 days on approximately a month's run to Singapore. The generator armature, which had given out for the third time because it was not properly earthed, and allowed lubricating oil to creep under the shaft from the pedestal bearing, was sent ashore and repaired, and at the same time the pistons of the generator were overhauled.

While at Singapore the Chief Engineer also reported to the Owner he had checked up on the lubricating oil remaining in the system and found a total shortage of 4950 gallons.

On the return voyage the entry of any items in the log book relating to "overhauls

and adjustments" and "repairs" to generators ceased prior to the arrival of the ship at Halifax. The voyage terminated 13 days later in New York on November 18, 1936.

Cropley was appointed to his position by Stanley Thompson and did not recognize any other superior, not even Thompson, in matters relating to the upkeep of the machinery which, in Cropley's opinion, involved the question of the seaworthiness of the vessel.

Cropley did not recall any instructions from his employer relating expressly to the Silvercypress except that the Managing Agents wrote to him concerning the excess loss of lubricating oil and requested him to ascertain the reason therefor when the vessel arrived in New York at the end of voyage 16.

When the Chief Engineer reported the shortage of 4950 gallons of lubricating oil enroute to Singapore and 1440 gallons on the return voyage, Cropley did not believe there had been any loss and stated that after they had talked it over, the Chief Engineer agreed with him.

Matfin also denied, at the trial, there was any loss of lubricating oil but in a previous deposition taken in San Francisco, he had testified there was a loss due to "leakage at crankcase sealing bars and main engine holding down bolts" and "would first go onto the tank tops and then into the bilge."

In a report which Cropley made to the head office in London after the vessel sailed on voyage 17 (Ex.LL) he wrote:

"All holding down bolts were tightened here. The working of main engines on the tank tops had slackened the sealing bars and these were found to have been leaking oil out and water in, in several places.

"All sealing bars in Starboard engine sump were removed, faces cleaned, studs renewed where necessary. * * * There was insufficient time to rejoint any more than a few of the worst bars in Port engine sump."

He mentioned this "loss" in his report of Nov. 27, 1936, because the Chief Engineer told him he had written a complaint and Cropley "wanted to back up the Chief Engineer's testimony."

In his complaint to Thompson, the Chief had ascribed the leak through the sealing bars as one of the reasons by which he accounted for this excessive shortage.

Cropley did not know what the Chief had written, but he wrote as he did "not really to endorse but to corroborate his statement." It was not Cropley's real belief it was right and therefore he did not intend "to totally back him up" but "to appear to back him up is what I really meant to imply."

A few excerpts from the testimony of Cropley will likewise indicate his general attitude.

When the Chief Engineer reported that on July 22, 1936 the timings on #2 generator were found 20° late, Cropley poohpoohed it as impossible; he did not believe any Diesel engine could be run or even started with a camshaft 20° late,—other parts would have to be in an abnormal condition.

Cropley told the Chief Engineer the key could not twist, but when the Chief told him he had filed the camshaft true, made a larger size key and fitted a tin liner, Cropley asked: "Well, you put it right?" to which the Chief replied "yes" and that was all that was said about it.

On cross examination, however, he remembered asking the Chief: "Do you think it is safe,—is it all right and him being satisfied. That is what I can remember about it."

And again he asked the Chief: "Did he think it was good enough repair to carry on to a repair port" and the Chief replied: "Yes" that he "had tried to hammer it in and had checked it and found it was tight and a good temporary repair."

However, Cropley made no examination of this temporary repair because it would mean stripping the engine or stripping the gear casing to do so, and denied that he knew the Chief Engineer wanted to have it permanently repaired at Capetown or Hong Kong. When asked why he did not have it fixed in New York, his answer was: "Because it was tight and it was unreasonable to take it out there and repair it when it is quite capable of going to the normal repair port."

Again he testified: "It is marked as repaired and I was satisfied myself that the Chief was satisfied that the repair, although temporary, was in perfect condition."

And still again: "The proper repair to put it in first class condition is to build up your camshaft by welding."

To what extent, if any, the failure to make this repair, contributed to the cause

of the fire, does not appear but if the tin liner or the sprocket wheel became loose it would be a competent producing cause for lateness in timing and overheating of the fuel pipe, exhaust valves and manifold, and was one of the items set forth by the Chief Engineer in the repair list prepared and forwarded by him from Manila to Stephenson, in response to a request from the latter to the Master of the vessel dated December 31, 1936, in which he said: "We are in receipt of instruction from Home to carry out all outstanding repairs when your vessel is at Hong Kong this time."

Although Cropley was aboard the vessel and spent at least 4 hours in the engine room on each of the eight days the vessel remained in port, his activities as supervising port engineer cannot be said to have been more than prefunctory.

Matfin testified that no work was done on the sealing bars on voyage 17 after leaving New York.

Enroute to Panama, the Chief Engineer wrote a letter, received by the London Office on December 15, 1936, stating:

"Considering the condition of the Main Engine Holding-Down Bolts and Crankcase Sealing Bars, I think it is quite evident the lub.oil losses have taken place at these points as well as contaminating the oil in the system due to sea water from the tank top leaking past the sealing bars, thus, no doubt accounting for the high content of water in the lub.oil voyage 16.

"In view of the work done on the Holding-Down Bolts and Sealing Bars by shore labour in New York I hope to be able to furnish you with a more favorable (report) during the current voyage.

"Owing to the shortage of time in New York it was not possible to have all the Sealing Bars re-jointed, there being only three bars done on the Port Engine, but I think Mr. Cropley will be supplying you with a full report."

The log books on the fatal voyage are not in existence, but Matfin described the conditions on voyage 17 as comparable to those on voyage 16, and testified that enroute to Manila, both main engines were stopped on account of generator trouble. The sealing rings gave out and water got into the crankcase. He said undue heat could have caused it; that if the piston rings were unduly hot it subjected the rubber rings to undue heat and permitted water to get into the lubricating oil. Generators

2 and 3 were in operation at the time. No. 1 was a standby and No. 4 was being overhauled. It was found that No. 2 was leaking sea water in its lubricating oil and when he undertook to substitute No. 1, that was leaking too.

When the vessel arrived at Manila, the Chief Engineer transmitted a list of wanted repairs to Stephenson under date of January 8, 1937.

It is not to be understood, of course, that this letter was considered as giving the respondent's notice of the repairs then required, but it is relevant upon the question of the condition of the vessel at that time. The Chief wrote:

"* * * generators continue to be a constant worry and strain and require a continual renewal of parts. I have come to the conclusion that owing to the bad condition of the pins, journals and bearings the lub.oil does not reach the top end bearings, with the result of all sorts of grief in the form of slack bushes, both on the pin and in the eye of the rod, slack gudgeons and broken pistons. All the pistons in these machines require to have the grooves skimmed and oversize rings fitted. I have had to renew two generator liners within the last month owing to slight cracks appearing at the top of the cylinder directly in line with the cyl.lub. oil connection, both cyl's are cracked in the same place.

"Would it be possible (or cheaper) to have generator exhaust & inlet valve bodies made in Hong Kong? The majority of the exhaust valve bodies here requires to be renewed, they are short in the length, warped, and the spindle guide badly worn.

"No. 2 Generator (A.S.) requires to have the after section of the camshaft built up and the sprocket wheel made a tight fit on the shaft."

This refers to the repair made on July 22nd, which the Chief first suggested be built up and welded at Capetown, then at Hong Kong on voyage 16, and which Cropley passed in New York before the commencement of voyage 17.

The Chief further wrote: "I have found it necessary to have the M.E.Lub.Oil Coolers cleaned while at this port with shore labour. As you are no doubt aware the vessel was aground for two hours in the Savannah river and naturally the whole of the cooling system fouled with mud and silt. During the last few days of this passage it was a constant source of worry to

keep temperatures down. Before the coolers could be cleaned with the acid a large quantity of mud and silt had to be removed."

This brings us to the consideration of the circumstances under which the fire occurred.

Mr. Kates, called as an expert by the respondent, gave as his *opinion* that a leak occurred in the overhead fuel supply pipe and that oil from that supply pipe falling upon the upper parts of the engine, was naturally heated there, some of it was possibly vaporized by the high temperature that prevailed, and was probably caught or driven into the air intake of one or more cylinders, probably cylinder No. 2. So that it was the popping of the safety valve due to this admission of fuel in the air intake of No. 2 cylinder which, in his opinion, caused the actual ignition of the oil, around at that time, and the fire spread very rapidly because of the apparently considerable amount of oil being discharged from a leak.

Mr. Kates thought it was unlikely that a leak from one of the fuel pipes leading from the fuel pump would spray onto the air-intake valve and be sucked in a cylinder.

Cropley thought the fire, as reported by Ingram, was out of all proportion to the previous fire on No. 4 generator on voyage 16, and, since the amount of oil delivered by one of the fuel pumps is infinitesimal and could only maintain a very small blaze, in his *opinion* an overhead pipe must have fractured, and this fracture, or partial fracture, of the fuel line immediately above the engine, the position of the No. 2 generator, and the evidence that No. 2 release valve lifted indicated to him that the pipe that ran from the main line to the booster pump was the pipe that fractured.

Stephenson visited and inspected the engine room after the fire, and had an opportunity to interview Ingram and other witnesses. He made a first report to the owner dated January 23, 1937, in which he said: "It appears that Ingram had just come out of the engine room at 3:30 A.M. leaving everything in an apparently normal condition when a repetition of reports caused by the lifting of a generator cylinder relief valve caused him to return, having been away for only a few moments."

But he did not incorporate that in the statement which he prepared and Ingram signed (Exhibit A). He testified at the trial that in his interview with Ingram in the hospital the latter led him to understand that a pipe was dripping a little bit the last time he saw it on the evening of the night before, and that and that a little tin gutter had been put in to catch this drip, and they were going to fix it the next day. But he recanted that statement: "When I saw Mr. Ingram in the hospital there were three or four of us visiting, and it was in the conversation which took place there, one or another mentioned the fact that there had been a leak taken care of in the manner that I described. Whether it was Ingram that made that statement or whether it was one of the others everyone was agreed." (973)

However, Stephenson did not put it in either of his reports to the owners, because "at that time when I was getting this information I had not been into the engine room to check whether such a thing could be in it."

In his second report to the Owners dated February 1, 1937, referring to his inspection of the engine room, after the fire, Stephenson said: "Everything was covered with about two inches of sludge and debris which prevented anything like a careful examination being carried out but it was observed that the 3/4" fuel oil branch pipe was actually necked off at the flange where it takes the tee piece on the main fuel supply line to numbers 1 and 2 generators and the donkey boiler. The fracture is practically over the top of No. 1 cylinder of No. 2 generator and it seems quite clear that oil could have sprayed from the fracture on to the hot cylinder covers, hot exhaust branches and exhaust manifold of the machine and there been heated sufficiently to be ignited by flame and sparks from a cylinder relief valve."

With this report he enclosed the statement of Ingram (Exhibit A) and another which he obtained from the Senior Fifth Engineer, Duffy, who stated: "I took the first watch until midnight and was relieved at midnight by Mr. Camblin who took over under normal conditions allowing me to turn in." (973)

His reason for not having taken a statement from Camblin was that: "I got all the information I wanted."

On the trial Stephenson was of the *opinion* that it was the fore and aft pipe serving generators No. 1 and No. 2 which fractured, although he later said "Whether that is the exact pipe I am questionable," and subsequently it was his opinion that the

pipe which broke was the spill pipe from the generator back of the settling tanks above. If so, he testified he thought the fire started by a leak which developed in the spill pipe above the generator splashing the oil down in a continuous stream so that when it came in contact with the upper hot surface of the generator (No. 2) it was vaporized, drawn into the air intake valves, and supercharged them, thus causing the relief valve to lift and the flame emitted therefrom set the fire going; and it was difficult to put it out because of the quantity of oil falling from above.

Petersen declared the No. 2 safety valve on No. 2 auxiliary engine could only be lifted continuously if there was excessive pressure in that cylinder, and that consequently some oil got in from an outside source because the fuel pump was controlled by the governor. He assumed it had been reported that the fuel line above the engine was a little leaky in the afternoon and a spout was made in order to collect this oil and therefore, if such an oil pipe above the engine gave out, the oil would come down from the auxiliary and be sucked into the air tank strainer and thus into the cylinder, causing the safety valve to open and a big flame to shoot out and come in contact with the oil that was hot and perhaps some fumes, but to keep such a big fire going it must have been fed by oil from some source as that which came out of a fuel pipe to feed such a big fire.

Exhibits XX and WW show the location, with all unnecessary detail omitted, of the fuel pipes from the starboard settling tank to the generators, and the return or spill pipe to the port (dirty oil) settling tank, whose main source of supply was from the double bottom tanks.

Exhibit 4–C–2 shows the position of the air intake valves; Exhibits 28 and 29, leaving out unnecessary detail, show the position of the several intake pipes, end and side views. Those latter sketches are, of course, diagrammatic and not made according to scale, but Mr. Petersen and Mr. Ford agreed on the applicable dimensions, from drawings made according to scale.

In rebuttal it was the opinion of Mr. Ford that the fracture that was alleged to have occurred at the joinder of the tee piece, according to Mr. Stephenson, was not the inducing cause of the fire, because it was too far removed from the engine and tops of cylinders.

It was Mr. Ford's opinion that the suggestion of respondent's witness that the oil reached the top of generator No. 2 and was pulled in through the intake pipe of No. 2 cylinder and caused the lifting of the relief valve on No. 2 was too far fetched because the air intake pipes are vertical pipes with slots of some small width (1/16th of an inch) and to get in the oil must be vaporized in the immediate vicinity of the pipe so that the pipe would be surrounded by vapor that would be sucked in and it would have to strike the pipe and run down and be drawn into the slots in liquid form, and owing to the location of the pipe that conveyed the oil, he did not see how that could happen.

This brings me to a consideration of the testimony of Ingram.

If he were a trustworthy witness, his testimony would vitalize unspoken words contained in the mass of documentary evidence and warrant and sustain inferences establishing the required causation. Analyzing the statements made by him:

1. In Exhibit 20, which Ingram wrote in the hospital, he details his acts and observations on the night of the fire but offered no explanation or theory of its origin. In an addenda, apparently written some time thereafter, he said:

"If that string had been tied so that it could loosen the fire need not have occurred as five mins. approx. elapsed between start of knocking & fire.

"The fire was not caused by a broken pipe as supposed for I would have been drenched where I stood. No. 2 & 3 fuel pipes to valve were broken as the floor-plates round the back & between 1 & 2 were glistening with oil. The fire started at my feet & whether it was caused by hot carbon from No. 2 & 3 cyl. safety valves I cannot say."

2. The statement which he made immediately upon his return to England (Exhibit J) concludes: "That in deponent's opinion the cause of the casualty was leakage of fuel oil onto hot exhaust manifold."

3. In the communication which Ingram wrote to the Receiver of Wrecks on May 16, 1937 (Exhibit 19) he states:

"Knocked off at 5 p.m. Slept on settee after dinner until midnight. Had tea with Junior Camblin & 5th Duffy. Heard Duffy warn Camblin re leaky pipe on No. 2 generator. Enquired re pipe & was told

Jun. 4th Trenmouth had drawn the Chief's attention to it. Duffy tapped leaked (sic) with hammer & fixed up funnel & pipe to catch drip. I advised Camblin to follow line to settling tank as he did not know the valve on Sett. tank. Advised Duffy to see 2nd & 3rd (whose night aboard it was). I then went to my room.

\* \* \* \* \* \*

"Re the pipe that was leaking I understand it snapped but that must have been during or after the fire as I & Camblin were under the pipes. I never saw the leak actually. The funnel that was put up was to lead the drip into a drip-pan on the camshaft. Duffy put it up. I was told afterwards that Duffy took my advice & went to the 2nd who sent him to the 3rd whose night aboard it was. He, I understand was assured by Duffy that it was not dangerous. Camblin also took my advice & found the control valve on the tank (So he told me afterwards)." \* \* \*

"I can only say the fire seemed to start at my feet & I thought at the time it was a spark from No. 1 Gen. Commutator which was sparking badly. The electrician was not to blame for the sparking as the oil came from the forced L.O.pipe to the pedestal bearing. The other alternatives were: Starting Air pipe may have become red hot with pre-ignition melting the valves & allowing the gas into the line. That may have caused a piece of dirt or carbon to fall from the red hot pipe onto the oil or the floor plates. There was the explosion from the safety valve & a fan blowing above which may have blown carbon (hot) on to the oil. The oil cannot have been at a temp. to fire unless a flame or hot carbon was put to it."

4. In the statement which Ingram made to Geoffrey Warr & Co. (Exhibit 21) referring to tea in the messroom:

"I saw Duffy there and I heard him warning Camblin that there was a fuel pipe leaking on No. 2 Generator. I did not actually see this pipe, but it was the one from the starboard tank to Nos. 1 & 2 generators. The leak was at the neck of the branch pipe leading to No. 1 generator."

"Duffy had a filler and pipe under it to catch the drips and lead them to a proper drain. I am positive this pipe did not break before the fire. If it had broken, Camblin and I would have been drenched with oil and burned. Duffy told me that the leak started in Trenouth's watch and that he had spoken to the Chief Engineer about it and that the Chief Engineer had said it was all right. Duffy told me that he was not satisfied with the condition of the pipe and had stopped the leak as far as he could and fixed the pipe and funnel in position to catch any drips. He said he had also since reported it to the Third Engineer who was on board that night and that he (Milne) (Millan) on being assured that the leak was not serious had approved the action which had been taken."

\* \* \* \* \* \*

"I did not have time to note how the outbreak began, but in my opinion, it was due to the feed pipe from the cylinder fuel pump to the fuel valve being fractured close to the valve itself when the generator was jumping on the bedplates, owing to my being unable to release the governor. The effect of such a fracture would be to spray oil in all directions and particularly over the exhaust manifold which was situated on the starboard side of the generator."

There are certain statements in Exhibits 20 and 21 which lead me to believe that Ingram added to his previous accounts because of his bitterness or resentment and his disposition, as he said, to give the respondent a "headache."

■ However, since the libelants offer his testimony, I am considering it against them. I am satisfied that the Silvercypress was unseaworthy on voyage 16 and throughout voyage 17 up to the time of the fire, in the way of the auxiliaries, by reason of the neglect of the owners, but the libelants have failed to establish that the cause of the fire was solely attributable to such unseaworthiness.

The facts in this case do not bring it within either The Sandgate Castle, supra, or The Doris Kellogg, D.C., 18 F.Supp. 159.

In The Doris Kellogg case, supra [18 F. Supp. 165], Judge Goddard found: "There was an accumulation of explosive vapor in the No. 5 dry cargo space which had seeped in from the surrounding tanks of oil," which "was ignited by a spark from the electric wires running from the panel box (F) through the No. 5 dry cargo space," and: "there was nothing else in this empty space to ignite it."

In The Sandgate Castle, supra, the engineering representative of the owners went in the ship from London to Hull and, upon his observations, he recommended the repairs to be made. The vessel sailed be-

fore they were completed in order to be at her berth in New York on the advertised date of sailing, and it was found that the cause of the fire was directly attributable to the failure of the owner to make specific repairs, the necessity for which was brought directly to the notice of the owner.

In the case at bar, it seems quite possible that the fire on January 13, 1937, resulted from circumstances similar to the fire on July 6, 1936 on voyage 16, but the testimony of Ingram concerning the leak on the afternoon preceding the fire on voyage 17 is just as probable a cause, and, in that case, the failure to repair the leak seasonably was due to the negligence of the engineering staff and not of the owner. But, had that leak been so repaired, it cannot be said the fire would not have occurred. The respondents sacrificed that care and caution which they were obligated to exercise to insure protection and safety to the vessel.

The limitation of turn-arounds in port and the reluctance to spend money for shore labor outside of Hong Kong demonstrates this. The failure to have the vessel overhauled at Hong Kong after notice of conditions on voyage 16, from New York to Capetown, or at Manila, and the certification by Cropley that the vessel was seaworthy when she sailed from New York on voyage 17 deserve condemnation. But considering the history of the fire statute (See Earle & Stoddart, Inc., v. Ellerman's Wilson Line, Ltd., 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403, and references there cited) I feel it must be strictly construed, and therefore the libels are dismissed, without costs.

### On Supplemental Decision.

In the brief submitted on behalf of libellants, under the caption "The Issues" it is stated: "The greater part of libellants' loss resulted directly from the fire or from efforts to extinguish it."

At page 76, it is stated: "To establish respondent's liability under the Fire Statute it is only required that circumstances be shown from which an inference may reasonably be drawn that the cause of the fire was one which existed by reason of respondent's neglect."

In as much as the record disclosed that the fire resulted from one of two or more causes, and the causal connection between the fire and any particular cause and the personal negligence of the respondent was not established by the required measure of proof, the respondent was exonerated under the Fire clause.

Under the caption "The Issues" it is further stated: "In addition to the physical loss and damage to their cargo libellants sustained damage because, in a number of cases, respondent required, as a condition precedent to the delivery of such cargo remaining on the vessel after the fire as had value, that libellants make cash deposits with respondent as security for respondent's asserted claims against cargo for contribution in general average. Also, as a condition precedent to delivery after the fire of such cargo as was carried forward to and delivered at contractual ports of delivery other than Ilo Ilo, respondent required the payment of a second freight for the on-carriage, although it had collected full freight to the contractual ports of destination in advance. In addition, there were three shipments consigned to Manila which respondent overcarried to Ilo Ilo and which sustained damage during the course of the fire."

The Bills of Lading issued by respondent contained the following or a similar provision: " * * * In the event of accident, danger, damage or disaster before or after commencement of the voyage, resulting from any cause whatsoever, *whether due to negligence or not,* for which or for the consequence of which the shipowner is not responsible by statute or contract or otherwise, the shippers, consignees or owners of the cargo shall contribute with the shipowner in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo * * *. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and special charges thereon, shall, if required, be paid to the carrier or his agents prior to delivery." (Italics mine.)

Libellants' brief continues: "In view of this provision, libellants concede that the issue of respondent's right to contribution from cargo to any expenses and sacrifices of a general average nature which it incurred, is governed by the same principles as govern respondent's liability for the physical loss and damage sustained by libellants' cargo. However, although the cash security was collected in 1937, re-

spondent has never made any accounting and no general average adjustment has ever been issued. As a condition precedent to delivery of the cargo, respondent demanded and secured payment of some $125,000 and has simply kept the money."

■ There was no substantial argument made in the briefs upon this subject but, when it came to the preparation of Findings of Fact and Conclusions of ·Law, it seems to the Court that while the right to contribution is conceded, the libellants are entitled to an accounting and to a refund of any amount in excess of the liability thus established, if it be less than $125,-000.

In The Owego (Johnson Iron Works et al. v. The Owego, etc.), D. C., 289 F. 263, 265, 1923 A.M.C. 713, the Court said: "A court of admiralty has not the characteristic power of a Court of equity. The Eclipse, 135 U.S. 599, 10 S.Ct. 873, 34 L.Ed. 269; * * * A court of admiralty, in its decisions upon the ultimate rights of parties, may be moved from consideration of conscience, justice, and humanity, sometimes, to mitigate against the severity of contracts and modern exorbitant demands, (Ben. Admr. § 261), but it is not a court of chancery and has not chancery jurisdiction. (Hughes, Admr. [2d Ed.] 399, 400)."

A provision will be made in the Findings of Fact and Conclusions of Law which it is believed will prove appropriate.

The Bills of Lading also contained the following provision: "7. Also, that prepaid freight is to be considered as earned on shipment of the goods and is to be retained by the Shipowner, vessel or cargo lost or not lost, or if there be a forced interruption or abandonment of the voyage at a port of distress or elsewhere; and in the event of the cargo or a part of it being forwarded by vessels of the same Line, or otherwise, the cost of forwarding shall be payable by the Owners or Consignees of the goods and shall constitute a lien on the goods."

The libellants conceded: "That respondent's liability for the second freight which it required be paid in a number of instances, is also governed by the same principles as govern its liability for the physical loss of and damage to libellants' cargo."

Unless it be contended that the freight charged for on-carriage of the goods from Ilo Ilo to the point to which it was consigned was excessive, that issue has been disposed of by the decision already made.

The libellants' brief then continues: "There remain the three Manila shipments which were overcarried to Ilo Ilo and which for that reason sustained loss. We think it is clear that respondent is liable for deviating in connection with these shipments. However, the amount of damage which they sustained was quite small."

The only argument upon this point is contained under Point VIII of libellants' brief, and consists of one sentence followed by the citation of Wiles-Bement-Pond Co. v. Dampkiesaktieselskabet Balto, 2 Cir., 282 F. 235; General Electric Co. v. Argonaut Steamship Line, Inc., D.C. E.D.N.Y., 7 F.Supp. 710.

While neither of these cases involved damage or destruction by fire, the facts in this case appear to me to distinguish it from The Ida, 2 Cir., 75 F.2d 278, relied upon by the respondent. The deviation there complained of did not affect the presence of the cargo on board the vessel at destination where it was partially destroyed.

■ In the instant case the respondent was under a duty to deliver the cargo at Manila but negligently carried it on to Ilo Ilo. Conceivably, if there had been no fire, the libellants would have had a cause of action for damage, and it is not logical to say that by reason of the failure to discharge its obligation to make delivery at Manila, the respondent is entitled to the same protection under the Fire Statute as it successfully asserted with respect to cargo intended for, but not yet discharged at Ilo Ilo, or at subsequent ports of call. While it is stated the damage involved is small, the decision heretofore made by me must be modified to sustain the libel as to the Pacific Commercial Company.

No finding will be made concerning the legal status of the other libellants, their ownership of cargo, or their payment of extra freight or general average deposits in view of the stipulation of the parties that the determination of the liability in the four cases decided should be determinative of respondent's liability in all the other cases; and that proof of all formal matters in all other cases other than the four mentioned, should be postponed until after determination of the cause on the merits.

I take this to mean until the right of review has been timely exercised.