**AMERICAN CYANAMID CO. et al. v. BOOTH S. S. CO., Limited.**

United States District Court
S. D. New York.
July 25, 1951.

Bigham, Englar, Jones & Houston, Henry N. Longley, F. Herbert Prem and J. H. Simonson, all of New York City, for libellants.

Haight, Griffin, Deming & Gardner, New York City, W. Poor, J. McKown, Jr., New York City, for respondent.

234

McGOHEY, District Judge.

This is a libel for recovery for cargo lost when the West Point stranded May 17, 1946. Most of the claims were dismissed by consent prior to trial, leaving for adjudication only those of libellants New Trading Company (hereafter called New Trading cargo) and The Baker Castor Oil Company (hereafter called Baker cargo).

Libellants claim that respondent became liable as an insurer of their respective cargoes against all risks by reason of unjustifiable deviations prior to the stranding. I disagree.

The West Point was a British steamer of 4,998 gross tons, length over all 415 feet, breadth amidships 53 feet 6 inches. Captain Davies, who was in command, had been her master since March or April, 1938.

The vessel was operated by respondent for the British Ministry of War Transport to which she was under charter from her owners. She loaded cargo in Baltimore and New York and sailed from the latter for Brazilian ports. She arrived at Cabedelo in March, 1946, discharged some cargo and loaded the New Trading cargo for which respondents issued three bills of lading each of which listed New York as the destination and bore the endorsement "CARGO SHIPPED VIA BAHIA AND MANAOS."[1] Each bill also contained the following relevant provisions:

"It is agreed that the custody and carriage of the goods are subject to the following terms which shall govern the relations, whatsoever they may be, between the shipper, consignee, and the Carrier, master and ship in every contingency, wheresoever and whensoever occurring, and also in the event of deviation. * * *

"The legislation enacted in any country to give effect to the provisions of a draft convention promulgated at Brussels in the year 1922 by the International Convention for the Unification of Certain Rules relating to Ocean Bills of Lading (commonly known as 'the Hague Rules') shall be deemed to be incorporated herein when compulsorily applicable to the contract of carriage herein contained, especially including the United States Carriage of Goods by Sea Act, approved April 16, 1936, if this Bill of Lading evidences a contract for the carriage of goods by sea to a port of the United States, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. * * *

"I (B) (1) * * * It is further mutually agreed that as a part of the voyage between the terminii stated in the bill of lading, the ship, either before or after proceeding toward the port of discharge, may proceed to ports in or out of the ordinary route or of the scheduled or advertised itinerary, if any, and in or out of the usual or geographical order, and towards or away from or beyond the port of discharge, the Carrier and ship being authorized as part of the voyage contracted for, to call at any of the said ports in any order whatsoever, including ports beyond the port of discharge, to proceed backwards or forwards, to omit calling at any port, whether scheduled or not, and to call at the same port more than once; the Carrier and the ship are further especially authorized, as part of the voyage hereby contracted for, either with or without the goods on board, and before or after sailing, or at any stage of the voyage, to * * * remain in port, * * * *; the matters mentioned as part of the voyage contracted for shall include anything done by the Carrier or the ship for the purposes of this or any prior or subsequent voyage, or for any other purpose whatsoever.

"XII The terms of this bill of lading constitute the contract of carriage and supersede all prior agreements and understandings. The liability of the carrier (unless otherwise previously terminated) shall be restricted, as herein provided, from the receipt of the goods by the carrier until delivered by the carrier to the consignees or Customs, according to the regulations of the port of discharge, irrespective of whether or not the goods are over—or under—carried or transported by a route or means

1. The reference to Manaos, a port up the Amazon River, is of no significance here since the West Point stranded before reaching the Amazon.

or in a method not contemplated on shipment nor within any of the liberties contained in this bill of lading."

On March 31 the West Point sailed 85 miles south from Cabedelo and put in at Recife on April 1. She there discharged cargo which had been carried south from Baltimore and departed on April 15, the delay in departure having been caused by a shortage of lighters available for unloading.

Still sailing south, the vessel put in at Bahia on April 18 after a run of 406-1/2 miles from Recife. The call at Bahia was for the purpose of completing the discharge of cargo carried on the southbound voyage from the United States and loading northbound cargo. She remained a week at Bahia discharging, bunkering and loading the Baker cargo. No work was done on Good Friday, April 19, a general holiday in the port. Although the evidence is not clear, it appears that at Bahia the West Point began to be operated by respondent under a different charter.

The bill of lading for the Baker cargo listed Bahia as the port of shipment and New York as the destination. No intermediate ports of call were indicated and the bill contained provisions identical with those in the New Trading cargo bills.

Until shortly before leaving Bahia the West Point had been scheduled to sail north and call for cargo at Fortaleza, Tutoya and Maranhao in that order which was their geographical order from south to north. However, on the day she sailed she was directed to call at Tutoya first in order to catch the tides at Tutoya Bay on May 1. She was then to proceed south to Fortaleza and then north to Maranhao, thus passing Tutoya en route.

This was the course she followed. She left Bahia on April 25 and arrived at Tutoya April 30 having passed Recife and Cabedelo en route. After loading cargo she departed Tutoya May 5 and sailed 221 miles south to Fortaleza, arriving there on May 6. Cargo was taken on and on May 12 the West Point sailed for Maranhao where she arrived May 14 after having passed Tutoya en route. Loading took but a day and on May 15 she sailed north from Maranhao. The vessel stranded on a reef on May 17 and was lost together with the cargo involved here. The parties have stipulated that the stranding and loss of the West Point did not result from unseaworthiness.

■■ A deviation may be defined as a departure from the course of the voyage designated in the contract of carriage.[2] Since the New Trading cargo bills of lading which constituted the contract of carriage[3] specifically designated Bahia as a port of call on the itinerary of the voyage, it is clear that there was no deviation in carrying that cargo from Cabedelo to Bahia.

■ It is claimed, however, that the call at Recife en route from Cabedelo to Bahia constituted a deviation. Respondent's opposition to this claim on the ground that it is not within the pleadings is rejected. While the claimed deviation to Recife is not pleaded, it was advanced as a basis for relief at the trial without objection by respondent. Objection was first raised in respondent's reply memorandum submitted after trial. The fact that its vessel called at Recife can not have come as a surprise to respondent and I can see no other valid basis for its contention that it would be prejudiced by the grant of permission to amend the libel to allege that call to be a deviation. Consequently, and in accordance with the tradition of liberal Admiralty practice, the libel will be deemed to have been amended so as to allege a deviation to Recife.[4]

■ I conclude, however, that the call at Recife did not amount to a deviation since it was permitted by the contract of carriage—the bill of lading. Article I(B)

2. Scrutton, Charterparties 315–316 (14th ed.).

3. Bills of Lading, Article XII. See Dietrich v. United States Shipping Board E. F. Corp., 2 Cir., 9 F.2d 733, 741.

4. See The Syracuse, 12 Wall. 167, 173, 20 L.Ed. 282; The Rio Verde, D.C.S.D. N.Y., 69 F.Supp. 880.

(1) quoted above permits calls at ports in or out the scheduled itinerary, away from the port of discharge and for the purposes of a prior voyage.

■■ The language of a broad liberty clause must, it is true, be interpreted and cut down "to what is fairly applicable to the voyage which has been agreed upon and defined." [5] And so, the liberty to call must be limited to "ports substantially on the course of the voyage." [6] "The rule is one of interpretation, by which the meaning of words having a general significance is confined within the particular purpose of the agreement. But in ascertaining the true sense in which general words are used, the words themselves cannot be deprived of all meaning, for this would not be to interpret the agreement but to erase a part of it." [7]

In the present case Recife was a port "substantially on the course of the voyage" and while the West Point called there for the purpose of a prior voyage—the discharge of cargo which was loaded at Baltimore—that purpose was permissible under the provisions of the bill of lading. If these mean anything at all [8] it seems to me that they authorize the call at Recife and the time spent there while discharging.

Libellants assert another deviation in that the West Point called at Fortaleza and Tutoya out of their geographical order. They concede, however, that both were permissible ports of call though not specifically so designated in any of the bills of lading.

I find that the vessel proceeded to Tutoya first in order to catch the spring tides so that she might safely pass over the bar at Tutoya Bay and that this was done in order to decrease the elapsed time of the voyage from Bahia to New York. That the achievement of this purpose would benefit the shippers as well as the ship and was for the purpose of the voyage seems to me to be obvious.

■ The claim that this portion of the voyage constituted a deviation must fail since Article I(B) (1) of the bills authorized the vessel to proceed "in or out of the usual or geographical order, * * * to call at any of the said ports in any order whatsoever, * * * to proceed backwards or forwards." I conclude that the West Point's actual itinerary was of a type within the contemplation of the parties to the contracts of carriage. Here, again, it seems to me that if the words they used are to mean anything at all they authorize the vessel's course in first proceeding to Tutoya, it being conceded that Tutoya and Fortaleza were proper ports of call.

If I am wrong, and if the Tutoya-Fortaleza course did constitute a deviation, the Carriage of Goods by Sea Act [9] would then come into operation. Section 1304(4) provides: "Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: *Provided, however,* That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable."

This is the only section of the act which deals with deviation, and since it provides for liability only in the event of an unreasonable deviation, it can have effect only after there has been a determination that a deviation—a departure from the voyage contracted for—has occurred.[10] So, assuming the West Point deviated in calling at Tutoya before Fortaleza the question then becomes one of the reasonableness of such deviation.

5. James Morrison & Co., Limited v. Shaw, Savill & Albion Company, Limited, [1916] 2 K.B. 783, 793.

6. Leduc v. Ward, 20 Q.B.D. 475, 482; See Glynn v. Margetson & Co., [1893] A.C. 351.

7. The Frederick Luckenbach, D.C.S.D. N.Y., 15 F.2d 241, 243.

8. See The Blandon, D.C.S.D.N.Y., 287 F. 722, 725.

9. 46 U.S.C.A. §§ 1300–1315.

10. See Stag Line, Limited v. Foscolo, Mango and Company, Limited, [1932] A.C. 328.

In deciding that question we are accorded some guidance by the proviso of Section 1304(4). It seems to me, however, that this is not a case for its application. The purpose of the deviation, if deviation it was, was not to load cargo or passengers. The Tutoya cargo had already been contracted for and would have been loaded even if the vessel had first proceeded to Fortaleza. The West Point called at Tutoya before Fortaleza in order to decrease the duration of the voyage. This purpose, as I have said, would serve the interests of the libellants and respondent.

■ Was this a reasonable deviation? "The true test seems to be what departure from the contract voyage might a prudent person controlling the voyage at the time make and maintain, having in mind all the relevant circumstances existing at the time, including the terms of the contract and the interests of all parties concerned, but without obligation to consider the interests of any one as conclusive. * * * The decision has to be that of the master or occasionally of the shipowner. * * *" [11]

■ Applying this test to the circumstances under which the Tutoya-Fortaleza route was decided upon, I conclude that if it was a deviation it was a reasonable one and that respondent is not liable for it under the Act.

Submit findings and conclusions.