**HAROCO CO., Inc. et al. v. The TAI SHAN et al.**

United States District Court
S. D. New York.
March 31, 1953.

Bigham, Englar, Jones & Houston, New York City, for libelants, Henry M. Longley and F. Herbert Prem, New York City, of counsel.

Haight, Deming, Gardner, Poor & Havens, New York City, for respondents, Charles S. Haight, Richard G. Ashworth and Arthur D. Talbot, New York City, of counsel.

DIMOCK, District Judge.

Libelants in these suits had various interests in cargo carried on respondents' ship Tai Shan bound from Taku Bar off the North China coast to North American continental ports. The cargo was damaged by fire while the ship was off the direct route from Taku Bar to North American ports. The "Fire Statute", 46 U.S.C. § 182, has the general effect of absolving the ship from the consequences of fire. It is cargo's contention that conduct of the ship in departing from the direct route amounted to an "unreasonable deviation" and that this deviation rendered the ship liable for the damage caused by the fire despite the Fire Statute.

■ A deviation is "a departure from the voyage contracted for". American Cyanamid Co. v. Booth S. S. Co., D.C.S.D. N.Y., 99 F.Supp. 232, 236, affirmed on opinion below, sub. nom. Feuer v. Booth Steamship Co., 2 Cir., 195 F.2d 529; Swift & Co. v. Furness, Withy & Co., D.C.D.Mass., 87 F. 345, 348.

The Carriage of Goods by Sea Act in 46 U.S.C. § 1304(4) provides:

"Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: Provided, however, That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable."

The Act uses the word "deviation" in accordance with the above definition, as meaning a mere departure, and where the Act expresses the idea of an unreasonable deviation it uses that characterization. I shall use the same terminology in this opinion.

■ The Fire Statute on its face gives complete protection to the ship. Unless, therefore, a deviation constitutes something at least as serious as a breach of the contract of carriage, it cannot, in reason, deprive the ship of that protection. The Act, however, as appears above, provides in section 1304(4) that a "reasonable deviation shall not be deemed to be an infringement or breach * * * of the contract of carriage * * *". Hence we must inquire not only whether there

has been a deviation but also whether it was unreasonable.

In this inquiry Judge McGohey's opinion in American Cyanamid Co. v. Booth S. S. Co., D.C.S.D.N.Y., 99 F.Supp. 232, affirmed on opinion below sub. nom. Feuer v. Booth Steamship Co., 195 F.2d 529, supra, will well serve as a guide. He said in 99 F.Supp. on page 236:

> "The language of a broad liberty clause must, it is true, be interpreted and cut down 'to what is fairly applicable to the voyage which has been agreed upon and defined.' And so, the liberty to call must be limited to 'ports substantially on the course of the voyage.' The rule is one of interpretation, by which the meaning of words having a general significance is confined within the particular purpose of the agreement. But in ascertaining the true sense in which general words are used, the words themselves cannot be deprived of all meaning, for this would not be to interpret the agreement but to erase a part of it.'" (Citing cases in footnotes.)

That opinion teaches that we must first ascertain whether there has been a deviation in the sense of a departure from "the voyage contracted for". The "voyage contracted for" may be made up of two elements: first "the voyage which has been agreed upon and defined" and, second, "'what is fairly applicable'" thereto plus "ports substantially on the course of the voyage." The second element may be validly added by the parties through the use of a liberty clause in the bill of lading.

I shall first consider the first of these elements: "the voyage which has been agreed upon and defined." That is obviously the voyage as fixed by geographical description, usually by naming the ports of loading and discharge, as here Taku Bar and, for example, Boston. The direct route between these ports is the "voyage which has been agreed upon and defined" in the absence of a custom "'general and uniform in the business'", Smith v. United States Shipping Board Emergency Fleet Corp., D.C.S.D.N.Y., 2 F.2d 390, 391, which fixes some other route. No such custom has been shown here so that the direct route between Taku Bar and the ports of discharge is the "voyage which has been agreed upon and defined".

The parties here, however, have added the second element to that voyage by the use of liberty clauses in the bills of lading. They provide:

> "Received, * * * [certain cargo] * * * to be transported under or on deck by the vessel herein named and bound for the port or ports as stated on the reverse side hereof, via other port or ports, though out of the usual or geographical route, and via Panama Canal, Suez Canal, Cape of Good Hope, Cape Horn or Straits of Magellan, or otherwise, and subject to vessels engagements not hereby disclosed, and though altering the voyage or involving a deviation therefrom, and to be delivered * * * at the port of destination named on the reverse side hereof * * *.
>
> "* * * * * *
>
> "It Is Mutually Agreed as follows—
> "* * * * * *
>
> "The carrier shall have liberty * * to proceed to, or toward, or stay at any ports or places whatsoever or by any route whatsoever, although in a contrary direction to or out of the route to or beyond the port of discharge, once or oftener in any order, backwards or forwards, for any purpose whatsoever, and all such ports, places and sailings shall be deemed to be included within the intended voyage and shall not be deemed to be a deviation (this liberty is not to be considered as restricted by any words in this contract, whether written or printed).
>
> "* * * * * *
>
> "Clause Paramount—This Bill of Lading shall be governed by the laws of the United States of America including the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, * * *.
>
> "* * * * * *

"It Is Also Mutually Agreed As Follows:

"29. * * *

"The carrier reserves the right to deviate from the intended route or to change the route, before, at or after sailing on the voyage, and/or at any stage thereof, in the event that circumstances shall arise which render it advisable or desirable in the judgment of the master of the vessel to deviate from or change the said route. * *

· "Port Of Shipment: Taku Bar. ·

"Port Of Destination Of The Goods [e. g.] Boston."

The American Cyanamid opinion further teaches that, after determining the scope of "the voyage which has been agreed upon and defined", we can give some meaning to such a broad liberty clause but it must be cut down "to what is fairly applicable to the voyage which has been agreed upon and defined" and be limited to "ports substantially on the course of the voyage".

■ In this case, the broad liberty clause, cut down to what is fairly applicable to the voyage which has been agreed upon and defined, and limited to ports substantially on the course of the voyage, does not, in my opinion, give liberty to call at the Philippines. Hence there was a departure from the course of the voyage or, under technical terminology, a deviation.

■ We therefore pass to the question whether the deviation was an unreasonable one. There again, it seems to me, the broad provisions of the bill of lading can be given some effect but may not be given such complete effect as to permit unlimited deviation. Surely if the parties cannot validly give absolute liberty to extend the scope of "the voyage which has been agreed upon and defined" they cannot validly accomplish the same result by giving absolute liberty to deviate from "the voyage contracted for". While thus the absolute liberty to deviate, given in this case, cannot be completely effective, the fact that the parties used words which would literally effect such liberty may be

considered with other circumstances in the course of determining whether the deviation in question was reasonable.

■ On this question the burden is on the ship to show that the deviation was reasonable. That follows from the fact that the deviation was for loading cargo since the Carriage of Goods by Sea Act quoted above, 46 U.S.C. § 1304(4) contains the proviso: "Provided, however, That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable."

■ Usage is one of the factors which may be lawfully considered in determining this question of the reasonableness of a deviation. While as above indicated, no custom can substitute anything for the direct route as the "voyage which has been agreed upon and defined" unless such custom is " 'general and uniform in the business,' " so that no usage of lesser extent is material on the question of whether or not there is a deviation, Smith v. United States Shipping Board Emergency Fleet Corp., D.C.S.D.N.Y., 2 F.2d 390, supra, it by no means follows that a less-than-uniform usage is immaterial on the question whether the deviation is reasonable. It cannot be gainsaid that a deviation which was adopted by 80% of all vessels would be more nearly reasonable than one adopted by only 8%. In other words one of the factors in reasonableness is usage.

Turning now to an examination of the facts bearing upon the question of reasonableness, the Tai Shan was engaged as a general ship in the Barber-Wilhelmsen Line service between the Far East and the United States. This service began in 1929 and has been maintained continuously since then except during the years from 1941 to 1947.

The Tai Shan arrived at Taku Bar on September 22, 1947 as the last port of call of her outward voyage from the United States. She had unloaded some of the outward cargo from the United States at Ma-

nila and completed unloading the outward cargo at Taku Bar.[1]

After the outward cargo had been discharged at Taku Bar on this occasion, the Tai Shan loaded at Taku Bar approximately 150 tons of homeward cargo, all to be carried to Atlantic Coast ports of the United States, except one shipment for Panama City.

From Taku Bar, the Tai Shan sailed on September 26, 1947 for Manila, arriving there on October 1, 1947. From then until October 24, 1947, the date of the fire, and thereafter she visited various ports in the Philippine Islands loading cargo and making repairs. From the Philippine Islands, the Tai Shan proceeded to ports in Japan and finally to destinations of the cargo involved in these suits. It is the proceeding via the Philippine Islands that libelants primarily rely upon as constituting an unreasonable deviation. They point out that this added 4,858 miles and 46 days to what a direct route would require.

The evidence with respect to the practice of the Barber-Wilhelmsen Lines in conducting its Far East trade since its inauguration in 1929 is that it made 150 homeward voyages from the Far East to the United States up to the time of the voyage of the Tai Shan concerned in these suits. On every one of these voyages homeward cargo was loaded at ports in the Philippine Islands. However calls were frequently made at other ports in China after the Philippines as part of the homeward voyage. Ships of the Barber-Wilhelmsen Line had called at Taku Bar on six occasions prior to September 1947. On each of these occasions, the call was part of the outward voyage and the ships later proceeded to the Philippines and loaded homeward cargo. Five of these calls were made prior to 1932 and one was a prior voyage of the Tai Shan in 1947 when she not only touched at Taku Bar but loaded cargo there.

Between 1932 and 1946 cargo originating at Taku Bar was generally sent to Japan or Shanghai for further transshipment.

The evidence with respect to the routes followed by ships of the various lines which called at Taku Bar during the postwar period indicates a diversity of routings. There were seventeen ships which loaded cargo at Taku Bar and later arrived at North American ports during this period and before September 26, 1947, when the Tai Shan sailed from Taku Bar with the cargo involved in these suits. Of these ships two proceeded directly to the North American ports, one proceeded via Japanese ports and/or Honolulu only, four proceeded via one or more of the ports of Tsingtao, Jinsen and Hulutao, four proceeded via the Philippine Islands and six proceed via Shanghai and Hong Kong. Libelants regard the route from Taku Bar via Japan or via Honolulu as being a direct route and this would seem to be so. Apparently they also consider the ports of Tsingtao, Jinsen and Hulutao to be so close to Taku Bar or a direct route from Taku Bar that these voyages should be regarded as following a direct route. Those ports are in the general area of the Asian Pacific Coast where Taku Bar lies and here again libelant's position seems correct. When, however, they claim that voyages via Shanghai and Hong Kong amount to direct routes from Taku Bar, I must disagree.

Hong Kong is about 1,418 miles[2] south of Taku Bar and away from the direct easterly route via Japan, while Manila is about 1,729 miles south of Taku Bar. To say that the route via Hong Kong is direct while a route via Manila is a deviation is beyond my powers of discrimination. It is plain that neither is a direct route and that both involve a considerable departure to the south.

Thus I find that some seven of these seventeen ships proceeded by more or

1. Taku Bar is the discharging and loading port for Tientsin. Because of the shallow depth of water over the Bar, it is necessary for ocean-going vessels to lie at anchor off Taku Bar and the discharging and loading of cargo is done by lighters.

2. Table of Distances Between Ports Issued by the Hydrographic Office of the United States Navy. H.O. No. 117 (1943 Ed.) p. 434.

less direct routes, while ten of them took a considerable departure to the south. Of the latter group, four ships, or almost 25% of all, proceeded via the Philippine Islands.

Besides these ships which loaded cargo at Taku Bar other ships proceeded from Taku Bar to North American ports during this same period though it is not shown that they loaded cargo there. If these ships were included in the tabulations these figures would be as follows: six voyages directly to North American ports, two voyages via Japan and/or Honolulu only, six voyages via one or more of the ports of Tsingtao, Jinsen and Hulutao, eight voyages via the Philippine Islands, eight voyages via Shanghai (all but one of which also included Hong Kong) and one voyage via Guam. Guam appears to be considerably south of a direct easterly route to North American ports and I would regard it as a southerly departure from that route. Thus the summary would be: fourteen ships followed more or less direct routes, while seventeen followed a route involving a southerly departure and, of the seventeen, eight or 25% of all followed a route via the Philippine Islands.

▆▆▆ As above indicated, the evidence with respect to these ships just added to the tabulations does not show that they carried any cargo from Taku Bar. In some instances, the evidence rather establishes that they did not carry any cargo from Taku Bar. In determining whether a route was reasonable for a vessel for the purpose of deciding whether she committed an unreasonable deviation in carrying cargo between any two points, I should think that prior voyages might be considered only when cargo was loaded at one of those two points and delivered at the other. The fact that ships have frequently followed a particular route between the two points when not carrying cargo from one to the other and therefore not likely to be noticed by shippers should not have any bearing on what would be reasonable for a ship that is carrying cargo between those points. Therefore, I conclude that none of the ships not shown to have carried cargo from Taku Bar may be considered in determining the reasonableness of the route in these suits.

The result then is that, after the war and prior to the voyage in question, almost 25% of the ships carrying cargo from Taku Bar to North American ports proceeded via the Philippine Islands and the only voyage made by the Barber-Wilhelmsen Line since 1932 and prior to the instant one was also via the Philippine Islands.

That the route followed by the Tai Shan was reasonable is evidenced by many other facts. Before the war some of the shippers of the cargo involved in these suits were familiar with the Barber-Wilhelmsen route homeward via the Philippines. During the post-war period many of those connected with the cargo involved in these suits either as shippers, consignors or owners (libelants in these suits) were similarly involved in prior shipments of cargo from Taku Bar via the Philippines. There is no evidence of an objection or protest having been made by any of these persons to such a route. True, some shippers before the war had refused to make shipments via the Philippines, but there was no such evidence dealing with the post-war period. Rather there was some evidence that conditions were unsettled in Tientsin, that the currency was depreciating and that shippers were anxious to get their cargo shipped irrespective of route in order that they might obtain bills of lading and quickly negotiate them.

Another line, the Pacific Orient Express, it was testified, originally planned to operate its service to China, Japan and Korea. This line attached a great deal of importance to its China business. Nevertheless, it found it necessary to extend its service to the Philippines, concluding that such a route would not cause the line harm with respect to its shippers in Tientsin or North China despite the lengthening of voyages carrying cargo homeward from those ports.

Finally, it was shown that the freight revenue from the small amount of cargo taken on at Taku Bar could contribute only a small part of the expense of operating the Tai Shan on its homeward voyage.

The loading of the Tai Shan at Philippine ports was not in geographical order.

The Tai Shan arrived at Manila on October 1, 1947. At Manila, her deep tanks were cleaned to load coconut oil in Cebu and after that she proceeded to Cebu, where she loaded as much coconut oil as was then available and also a quantity of copra and hemp. From there she went to Masinloc to take her turn at that port's only berth and thence to Tabaco (which likewise had only one pier) where she loaded some hemp. The ship then returned to Cebu on October 22, 1947 to load the remainder of the coconut oil and other homeward cargo. There was some delay there because of the breakdown of the shipper's oil machinery. It was planned that the Tai Shan would then go to Manila and sail from the Philippines before October 30th but, on October 24, 1947, while still at Cebu, the fire broke out.

There was testimony that loading conditions in the Philippines were unsettled in the post-war period and that the port facilities were poor. Further, the shipping manager of the Barber-Wilhelmsen agent in the Philippines testified that, while an effort was made to load at Philippine ports in geographical order, very often this could not be accomplished. An official in charge of the Pacific-Orient Express Lines and the Pacific-Australia Direct Line testified that it was impossible to load cargo in the Philippines in geographical order. In none of the prior loadings of the Barber-Wilhelmsen ships in the Philippines during the post-war period was a strictly geographical route followed.

With respect to the propriety of the time taken to load the Tai Shan, the practice of the Barber-Wilhelmsen Line, before 1939 and after 1948, was to try to complete loading in the Philippines within fifteen days but, during the post-war period up to 1948, the endeavor was to load as quickly as possible. The loadings in the Philippines prior to the loading of the Tai Shan took approximately a month. The loadings of the Pacific-Orient Express Line ships in the Philippines took from 21 to 30 days. At the time of the fire only 24 days had passed and if the fire had not occurred on the Tai Shan she would in all likelihood have completed her loading in 30 days.

Under all circumstances of this case, I find that the deviation of the Tai Shan in proceeding to the Philippines and loading cargo there was reasonable. A substantial proportion of ships carrying cargo from Taku Bar to the United States during the post war period proceeded via the Philippines without any evidence of complaints by any interested persons. Another line found it necessary to follow such a routing. Usual routing practices and the prevailing conditions in the Philippines justified the ship's conduct there. All these factors taken together with the very wide liberty clauses in the bills of lading are sufficient to establish the reasonableness of the deviation committed by the Tai Shan.

If I am wrong and there was an unreasonable deviation committed, the question next arises whether an unreasonable deviation deprives the ship of the protection of the Fire Statute even if it is not the cause of the fire. The Fire Statute, 46 U.S.C. § 182 reads:

"§ 182. *Loss by fire.* No owner of any vessel shall be liable to answer for or make good to any person any loss or damage, which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner." [3]

I find that, assuming that there was an unreasonable deviation, libelants nevertheless cannot recover since they have not sustained the burden of proof that there was a causal connection between any such deviation and the fire.

---

3. A provision of the Carriage of Goods By Sea Act, 46 U.S.C. § 1304(2) (b) is so similar that, for the purposes of these suits, it does not require separate consideration.

The last word from an appellate court on the subject is found in Globe & Rutgers Fire Ins. Co. v. United States, 2 Cir., 105 F.2d 160. There Circuit Judge Augustus N. Hand, in affirming a decision that the Fire Statute barred recovery, said, 105 F.2d at page 166:

"The contention is also made that there was a deviation by the Zaca because of an unreasonable delay in sailing from Norfolk and a departure from the usual course in calling at St. Thomas, whereby the shipowner lost the benefit of the Fire Statute. A causal connection between the deviation, if any, and the fire was not established and accordingly the argument is negatived by our decision in The Ida, 2 Cir., 75 F.2d 278. See Earle & Stoddart v. [Ellerman's] Wilson Line, 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403."

I take this to be a holding that cargo, in attempting to establish that a deviation deprives the ship of the benefit of the Fire Statute limitation, has the burden of showing that there was some causal connection between the deviation and the fire. If the burden had been the other way around the court would have said "It was established that there was no causal connection between the deviation, if any, and the fire." That the choice of words was not inadvertent appears from the circumstances that, in a full statement of facts, there was no reference to any evidence on behalf of the ship that the bursting of a fuel oil feed line and the resulting fire which took place in the harbor of Port of Spain, Trinidad, where the ship had put in on a voyage bound for the River Plate from Norfolk, was not causally connected with the call at Port of Spain. In other words there is no discussion of any evidence that the fuel oil feed line would have burst even if there had been no deviation.

It is true that this interpretation of the language in The Zaca runs counter to a careful decision directly in point made by Judge Wolverton in The Indrapura, D.C. Or., 171 F. 929. There he said, 171 F. at page 939:

"There was a deviation, and while the respondent was purposely at fault the fire occurred. If it can be shown that the fire would have occurred notwithstanding the deviation, this would be a defense. But the burden is cast upon the respondent to maintain that defense; or, in other words, respondent must show that his fault was not a contributing cause to the loss by fire."

Accordingly he upheld a libel which alleged that the fire occurred during a deviation but which failed to allege a causal connection between deviation and fire.

The Indrapura was referred to by Circuit Judge Chase in The Ida, 2 Cir., 75 F.2d 278, 280, as not contrary to the result there reached. In The Ida the Fire Statute was given effect where, as the court said, 75 F.2d at page 279:

"For present purposes it has been established by the allegations in the answer that there was no causal connection whatever between the deviation and the fire."

It will be observed however that, in The Ida, the question of burden of proof decided in The Indrapura was not involved, so that Circuit Judge Chase's statement that The Indrapura was not contrary to the result reached did not amount to an approval of its rule as to the burden of proof.

The most recent decision on the subject, Hoskyn & Co. v. Silver Line, D.C.S.D. N.Y., 63 F.Supp. 452, does not throw doubt on my interpretation of The Zaca opinion, Globe & Rutgers Fire Ins. Co. v. U. S., supra. In the Hoskyn case the ship was under a duty to deliver some of its cargo at Manila but negligently carried it on to Ilo Ilo where it was damaged by fire. The Fire Statute was given effect as a defense with respect to the bulk of the cargo but was rejected as to that overcarried. In that connection The Ida was distinguished, with the statement, 63 F.Supp. at page 468:

"The deviation there complained of did not affect the presence of the cargo on board the vessel at destination where it was partially destroyed."

The evidence here was that, on October 24, 1947, while the Tai Shan was in the Philippine port of Cebu, a fire broke out in the cargo space where both the Taku Bar cargo and cargo loaded while in the Philippines had been stowed. The cause of the fire has not been established, although the officers of the ship seem to be of the opinion that it was due to spontaneous combustion of the cargo. The parties dispute the location of the origin of the fire and the evidence on this lacks certainty.

The Taku Bar cargo, greasy wool, was stowed in the after part of the cargo space and took up about two-thirds of the space, while the Philippine cargo, hemp, was stowed in the forward one-third of the space. The first signs of smoke apparently arose from the forward part of the cargo space. On opening the hatch leading to the cargo space, flames and smoke were seen in the forward part where the hemp was stowed and also along the hatch coamings on the sides. The circulation of air in that hold was down the after ventilators, forward in the hold and up the forward ventilators. Upon examination after the fire it was not possible to tell where the center of the fire had been.

On this state of the evidence, it cannot be said that libelants have sustained the burden of proving that the fire was causally connected with the alleged deviation in the Philippines. If the fire was the result of spontaneous combustion of the cargo the question whether it originated in the Taku Bar or in the Philippine cargo seems to me to be equally balanced. Although there definitely was flame and smoke in the forward part of the cargo space, that does not prove that the fire started there.

Moreover, since the Taku Bar cargo occupied two-thirds of the cargo space, some of it of necessity was stowed in the forward half of the cargo space and even if it were conceded that the fire started in the forward half it could not be said that the fire must have started in Philippine cargo as opposed to the forwardmost part of the Taku Bar cargo. Finally, the circulation of air moving forward in the hold was such that if the fire originated in the Taku Bar cargo it is likely that the fire would progress in a forward direction to the Philippine cargo. This circulation also discounts the significance of the fact that smoke was first seen arising from the forward part of the cargo space.

It might be urged that, in any case where a vessel, proceeding by a direct route, would have discharged her cargo before the date of a fire which damaged the cargo during a deviation, there must have been a causal connection between the deviation and the fire. Libelants have not, however, sustained their burden of proof that the Tai Shan, proceeding by the direct route, would have completed the voyage before the date of the fire.

It not being shown by libelants that the fire was caused by the presence of the Philippine cargo on board or that the fire originated in the Philippine cargo, or that, if the vessel had proceeded by a direct route, the cargo would have been discharged before the fire, libelants have failed to sustain their burden of proving a causal connection between the deviation and the fire.

Decrees may be entered dismissing the libels.

Submit proposed findings and conclusions in accordance herewith.