E. C. L. SPORTING GOODS, Plaintiff,

v.

UNITED STATES LINES, INC., Defendant.

Civ. A. No. 68–274.

United States District Court, D. Massachusetts.

Nov. 19, 1969.

Barry H. Gerstein, Edwin F. Trafton, Boston, Mass., for plaintiff.

Leo F. Glynn, Richard H. Wilson, Boston, Mass., for defendant.

## MEMORANDUM OF DECISION

GARRITY, District Judge.

Plaintiff shipped goods on a merchant vessel owned by the defendant shipping company and has brought suit under § 4(4) of the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(4), claiming that the vessel carrying the goods overseas from Germany to Boston, Massachusetts, breached the voyage contract by a deviation and that the plaintiff was thereby damaged. The controlling statute provides as follows:

> (4) Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: *Provided, however,* That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable.

The court ordered a separate trial on issues of liability, with respect to which the parties stipulated the relevant facts, except for the reasonableness of the deviation alleged by the plaintiff, and the authenticity of relevant documents. On the contested issue, the court held a hearing at which only one witness testified, the New England manager for the stevedoring company employed by the defendant to unload its vessels at Boston. Prior to the evidentiary hearing the parties filed memoranda of law.

The cargo involved comprised 33 cartons of skis, each containing an average of 6 or 7 pair, making a total of 213 pairs of skis. On October 25, 1967 defendant issued a bill of lading for the carriage to Boston of 18 cartons of skis from Bremen, Germany, and on October 28, 1967, a bill of lading for the carriage of 15 cartons from Hamburg, Germany, both aboard the vessel "American Ranger." The vessel arrived in the harbor at Boston on Monday, November 13, 1967. On the previous Friday the defendant requested that its contract stevedore supply six gangs of longshoremen to commence unloading the vessel upon arrival. However, the stevedore had committed all but three of its regular gangs to other jobs and its efforts to borrow gangs from other stevedoring companies or to make other arrangements were unsuccessful. The port of Boston maintains only 30 longshoremen

gangs. Upon learning of the congestion in Boston, as to which it had no prior specific notice, the defendant communicated with the port of Philadelphia, which maintains over 80 longshoremen gangs, and ordered the vessel to proceed immediately from Boston to Philadelphia, where it commenced discharging its cargo on Tuesday, November 14. The discharge of the cargo was completed on Thursday, whereupon the defendant trans-shipped the goods by truck at its own expense to Boston, where they were ready for delivery at the pier on the following Monday, November 20.

The skis being delivered to the plaintiff were a very small part of the total cargo being carried by the vessel American Ranger to Boston. The total weight of the plaintiff's goods was slightly in excess of one ton, whereas the total cargo destined for Boston weighed 2050 tons. The value of the plaintiff's skis declared to the Bureau of Customs was $5,792. The freight charged by the defendant to the plaintiff for carrying the skis totaled $143.74. The damages being sought by the plaintiff in this proceeding are $37,892 plus interest and costs, including $25,000 for loss of customers and good will. Plaintiff received its goods at Boston in good condition and claims no damages to the goods themselves.

If the vessel had remained in Boston and commenced unloading its cargo on Monday, November 13, with the three available gangs of longshoremen, unloading would have been completed, assuming that the longshoremen worked overtime, by the end of the week and the cargo would have been ready for delivery on the wharf on Monday, November 20. At the port of Boston there is no picking up of cargo by consignees on Saturdays and Sundays. Cargo unloaded on a Friday is available on the pier for delivery on the following Monday. On November 27, one week after the plaintiff's goods were on the pier ready to be received, trucking companies engaged by the plaintiff's agent picked them up and delivered them to customers of the plaintiff. If plaintiff's merchandise had been among the first to be unloaded, say on Wednesday, November 15, it might have been possible for the plaintiff to have obtained delivery sometime that week. However, there was no evidence of the location of the plaintiff's merchandise on the vessel, or of the time when it was actually unloaded, whether among the first goods to be discharged or among the last. Plaintiff made no request of the defendant for special handling of its shipment or that the carrier pay any other particular attention to the goods.

Both pertinent bills of lading contained the following "liberties" clause:

"7. In any situation whatsoever and wheresoever occurring and whether existing or anticipated before the commencement of, or during the voyage, which in the judgment of the carrier or the master, is likely to give rise to risk of capture, seizure, arrest, detention, injury, damage, delay, or danger, detriment or disadvantage to, or loss of any goods, the ship, or any persons, or to make it unsafe, imprudent, inadvisable or unlawful for any reason to receive, keep or load the goods or to enter to discharge or disembark the goods or passengers at any port, the carrier or the master * * * (b) at any time and whether or not the ship is proceeding toward or entering the port of discharge or the usual or intended place of discharge therein, may discharge the goods into any depot * * * or other place; (c) may have the ship proceed or return, directly or indirectly, to or stop at, any port or place, and discharge the goods, or any part thereof, at any such port or place into craft, or into or on any other place whatsoever * * *.

Any measures or procedure whatsoever authorized by this clause may be taken without notice to the shipper or consignee and shall be considered as taken as agent of the shipper or consignee and at their risk and expense, * * *."

■ Gilmore and Black, The Law of Admiralty (1957), at 157, states, "It would seem hard to deviate from such a voyage. But the courts have indicated that such a clause must be construed or limited only to authorize reasonable departure from the normal route," citing Grace & Co. v. Toyo Kisen Kabushiki Kaisha, N.D.Cal., 1925, 7 F.2d 889, Dietrich v. United States Shipping Board, 2 Cir., 1925, 9 F.2d 733, 742, and other cases. The former case held that such "liberties" clauses must be reasonably construed and the latter that the clause covers only "delays fairly ancillary to the prescribed voyage." [1] One might ask therefore whether a "liberties" clause should be given effect in a suit under § 4(4) of the Act. It would seem at least arguable that the inclusion of such a clause should affect the burden of proof on the issue of the reasonableness of the deviation, by placing upon the shipper the burden of proving the carrier's unreasonableness and relieving the carrier of the burden of proof imposed upon it by the proviso in the Act. However, the court knows of no case so holding and accordingly, especially in the light of P & E Shipping Corp. v. Empresa Cubana Exportadora E Importadora de Alimentos, 1 Cir., 1964, 335 F.2d 678, 680, which holds that the burden rests on the carrier, considers that the liberties clause is absorbed by the statutory presumption. Thus a single issue is presented for decision in this case, namely, has the defendant carrier overcome the statutory presumption that it acted unreasonably on November 13, 1967 in sending the American Ranger from Boston to Philadelphia to unload the cargo bound for Boston?

■■ The true test is what departure from the contract voyage might a prudent person controlling the voyage at the time make and maintain, having in mind all the relevant circumstances, including the terms of the contract and the interest of all parties concerned, without considering the interest of any one party as conclusive. American Cyanimid Co. v. Booth S.S. Co., S.D.N.Y., 1951, 99 F.Supp. 232, aff'd Feuer v. Booth S.S. Co., 2 Cir., 1952, 195 F.2d 529. In the case at bar the court concludes that the defendant carrier has overcome the statutory presumption and has established by a clear preponderance of the evidence that it acted reasonably in sending the American Ranger to Philadelphia to unload the Boston cargo there. The goods were not perishable. Philadelphia was but one day's sail away. The carrier made arrangements to transship the goods by truck to Boston where they would be ready for delivery at the pier as soon as they would have been had the vessel remained in Boston and been unloaded by a complement of longshoremen half the size of that which could do the job most efficiently. The defendant had received no special instructions from the plaintiff regarding the handling or unloading of the plaintiff's merchandise. The commercial purpose of the transaction between the parties was fully achieved.

Plaintiff relies heavily on Surrendra (Overseas) Private Limited v. S.S. Hellenic Hero, S.D.N.Y., 1963, 213 F.Supp. 97, aff'd 2 Cir., 324 F.2d 955. In the court's opinion the *Surrendra* case is clearly distinguishable and plaintiff's reliance is misplaced. There the plaintiff shipper's cargo, 2,500 long tons of steel plates consigned ultimately to the government of India for construction purposes, comprised 60% of the total cargo aboard the vessel Hellenic Hero. When the defendant carrier took on the cargo in New York it had reason to expect congestion at Vizag, India, the port of destination. When the Hellenic Hero arrived at Vizag and found no dock available, it made no attempt to arrange with the government of India for priority unloading of the cargo despite the fact that it was consigned to an agency of the government. Instead, without no-

---

1. Kroll v. Silver Line, N.D.Cal., 1953, 116 F.Supp. 443, 445, expresses a minority view, not here adopted, that diversions which are expressly permitted by the bill of lading contract are not deviations.

tice to the shipper, it retraced its voyage approximately 500 miles to Madras, where it unloaded the steel plates and disclaimed further responsibility. Plaintiff was obliged to trans-ship the goods to Vizag at its own expense and sued for the expenses of trans-shipment which the court awarded to the plaintiff on the ground that the deviation to Madras was unreasonable. The court found that, if the defendant had notified the plaintiff of the situation while the Hellenic Hero was still at Vizag, the plaintiff might perhaps have made arrangements with the government of India for priority unloading at Vizag, where a berth did in fact become available on October 17, six days after the unloading was completed at Madras. Defendant had charged the plaintiff $87,755 for carriage of the goods. The court found, at 102, that the defendant "took a gamble for $87,755 in freight that conditions (at the port of Vizag) would improve and it lost."

It is ordered that judgment be entered for the defendant and that the complaint be dismissed.