**PARNASS INTERNATIONAL TRADE & OIL CORP. and Sakson Ltd., Plaintiffs,**

v.

**SEA–LAND SERVICE, INC., Defendant.**

No. 82 Civ. 3307 (KTD).

United States District Court, S.D. New York.

Aug. 10, 1984.

**154**

Burlingham, Underwood & Lord, New York City, for plaintiffs; Alfred E. Yudes, Jr., New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant; Chester D. Hooper, Claudia D. Baker, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge.

Plaintiffs Parnass International Trade and Oil Corporation ("Parnass") and their marketing arm Sakson Ltd. ("Sakson") brought this action for breach of contract against the ocean carrier Sea-Land Service, Inc. ("Sea-Land"). Plaintiffs assert that Sea-Land substantially deviated from the contract within the meaning of the Carriage of Goods by Sea Act ("COGSA") 46 U.S.C. § 1304(4), rendering the carrier liable for damages allegedly incurred due to delay in the delivery of plaintiffs' goods. I held a two-day bench trial in this case on June 18, 1984. The following shall constitute my findings of fact and conclusions of law.

### I.

Plaintiff Parnass operates in the Greek market as a seller of raw materials. For the past seven years, it has been involved in trading polyethylene. Parnass would arrange for the purchase of polyethylene on the international market and then resell the product to customers in the Greek market. As part of its trading activities in 1980, Parnass orally contracted to sell to certain of its Greek customers a quantity of polyethylene. Accordingly, it purchased 180,-226 kilograms of bagged polyethylene from Cities Service Export, Inc. ("Cities Service").

For several years previous to this occasion, Parnass had been using defendant Sea-Land as its ocean carrier for shipment of plaintiffs' raw materials' purchases. Parnass would contact defendant's exclusive agent in Greece, George Callitisis Successors S.A. ("Callitisis"), and arrange for the shipment through Callitisis' salesman Nicholas Theoharis. On this occasion, Parnass arranged for Cities Service to deliver nine containers loaded with polyethylene to Sea-Land at Houston on June 16, 1980. Six of the nine containers sailed from Houston on June 17, 1980, onboard the Sea-Land vessel S.S. S/L Venture pursuant to bill of lading 961–536305. The remaining three containers sailed from Houston on June 23, 1980, on board the S.S. S/L Producer pursuant to bill of lading 961–536359. These bills of lading were issued on Sea-Land's short form which incorporated the long form by reference and which provided that the port of loading was Houston and the port of discharge was Pireaus, Greece.

The two ships did not carry the cargo directly from Houston to Pireaus, but rather, carried the cargo in accordance with Sea-Land's relay system. Sea-Land, as apparently with several large container ocean carriers, uses a relay system in which the first vessel is the line-haul vessel or the mother ship. This line-haul vessel carries the cargo transocean to a major relay point. At the relay point the cargo of the line-haul vessel is discharged to other smaller vessels, commonly labeled feeder vessels. These feeder vessels then carry the cargo to the discharge destination or to a second relay port and another feeder vessel.

In the instant case, plaintiffs' cargo was carried by the line-haul vessels Venture and Producer, from Houston to the first relay point, Rotterdam, Netherlands. The Venture arrived in Rotterdam on July 2, 1980, and the Producer arrived on July 6,

1980. The cargo was thereafter discharged from the line-haul vessels and loaded onto a feeder vessel the S.S. S/L Pioneer which left Rotterdam on July 11, 1980, and arrived in Algeciras, Spain on July 15, 1980. The cargo was again off-loaded in Algeciras, and loaded aboard the feeder vessel the Panarea. This vessel did not finally take plaintiffs' goods to Greece until July 31, 1980, arriving in Pireaus on August 4, 1980. Much of the delay apparently resulted from port congestion in Pireaus due to a strike.

Plaintiff claims that it expected to receive its cargo on July 16, 1980, thirty days after delivery of the cargo to Sea-Land at Houston. It based its expectations, in part on Sea-Land's schedule which indicated an approximate thirty-day shipping time from Houston to Pireaus, on estimates plaintiff asserts were given by Sea-Land's Pireaus agent, and on previous experience in which shipments had taken less than thirty days. Plaintiff, in fact, contends that defendant's Greek agent guaranteed delivery within thirty days.

According to plaintiff as a result of Sea-Land's failure to deliver the cargo within thirty days, all twelve of plaintiff's buyers cancelled their polyethylene orders. Apparently August is the major vacation month in Greece. Plaintiff asserts that it was thus unable to negotiate a sale of the polyethylene until September 1980, at which time the price of polyethylene had dropped approximately 20 percent. In addition, plaintiff contends that as a result of its failure to fulfill its contracts to supply polyethylene in July, it lost credibility in the market and was forced to withdraw completely. Plaintiff claims damages for the drop in polyethylene prices between August 16 and September 4, 1980, and seeks, in addition, a lump-sum payment for its loss of the entire polyethylene market.

I reject plaintiff's claims for two reasons: first, I find that defendant did not deviate from the contract of carriage; and even if Sea-Land did deviate, the deviation was reasonable.

## II.

COGSA provides that if a "deviation is for the purpose of loading or unloading cargo or passengers it shall, *prima facie*, be regarded as unreasonable." 46 U.S.C. § 1304(4). As part of its relay system, defendant twice off-loaded plaintiff's cargo and changed ships at ports unspecified in the bills of lading. In total, the cargo remained at these two other ports for twenty-five to twenty-eight days. If plaintiffs establish that defendant's actions constituted an unreasonable deviation, the defendant would be liable for all damages plaintiffs suffered. "The carrier becomes, in relation to the shipper, an insurer of the shipper's goods." *Calmaquip Engineering West Hemisphere Corp. v. West Coast Carriers Ltd.*, 650 F.2d 633, 638 (5th Cir. 1981). I find, however, that Sea-Land's relay system does not constitute a deviation from the contract of carriage for three reasons.

First, I note that the long form bills of lading specifically provided for the possibility of carriage on several vessels.[1] Although the short form bills of lading were used by Sea-Land for plaintiff's cargo, the short forms expressly incorporated the terms and conditions of the long forms. Plaintiffs assert that the short form cannot incorporate terms from the long form which differ materially from COGSA and which are not clearly stated on the face of the short form bill of lading. Although the carrier may not use such a device to impermissibly limit its liability, *see Encyclopaedia Britannica v. S.S. Hong Kong Producer*, 422 F.2d 7, 14 (2d Cir.1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25

1. Sea-Land's long form bill of lading paragraph 4 provided:

It is specifically agreed, without any limitation of the foregoing, that all goods, containers, trailers, or vans may be transferred, transshipped, and carried on several vessels en route in the port of shipment to the port of destination and such transfer, transshipment or change in vessel shall not constitute a deviation; and such transfers and transshipments on various vessels is contemplated, and anticipated by the shipper and owner of the goods.

L.Ed.2d 255 (1970), Sea-Land certainly could reasonably expect that the shipper's awareness of a long form bill of lading also gave it at least constructive knowledge of the existence of defendant's relay system therein described. The transfer of plaintiff's goods from one ship to another, moreover, did not increase the risk of damage because the polyethylene was non-perishable, well packaged, and the goods not inherently susceptible to damage.

■ Second, I note that plaintiff had dealt with Sea-Land on previous occasions in which Sea-Land had utilized its relay system. Sea-Land has been relaying cargo for at least the past nineteen years. Defendants' Greek agents credibly stated that Parnass was made aware of Sea-Land's relay system. Sea-Land produced substantial literature and advertising concerning its relay system. Given plaintiff's prior contractual undertakings with defendant in which the relay system was used as well as the widespread dissemination of information concerning the system, plaintiff acquiesced, waived, and/or agreed to the use of such a system in its contract of carriage on this occasion.

■ A third and final reason for concluding that there was no deviation from the contract concerns trade usage. While such a finding is not necessary to my holding, I note that defendant provided credible evidence suggesting that use of the relay system constituted a custom of the trade. A majority of the ocean going carriers apparently use such a relay system. This system permits the efficient shipment of cargo to various widespread destinations. If the line-haul vessel called at all ports for which they carried the cargo, the cargo obviously destined for later points would take a far longer time to reach their destination.[2] This system permits the cargo to reach their destinations quickly and all approximately in the same period of time. Plaintiffs claim that they have been involved in worldwide trade of raw material for over

twenty-seven years. Nevertheless, it contends that it was not aware of the use of the relay system by any carriers. This contention strains credibility too far. Accordingly, I find that no deviation within the meaning of section 1304(4) occurred in the instant case. *See General Electric Company International Sales Division v. S.S. Nancy Lykes,* 706 F.2d 80 (2d Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983).

■ Furthermore, even if I were to find that defendant's relay system constituted a deviation, I could not find it unreasonable. Despite plaintiffs' contrary assertion, I do not find that defendant's Greek agent promised a specific delivery date. Transoceanic shipping involves far too many risks for me to believe that an experienced agent would make such a promise. A short delay of eighteen days is not in and of itself unreasonable. It is just such a potential for strikes and port congestion which prohibits carriers from making hard and fast promises such as the one plaintiff contends existed here. Moreover, a relay system operates to efficiently deliver plaintiff's goods, and as implemented here, did not constitute unreasonable delay.

In *American Cyanamid Company v. Booth S.S. Co.,* 99 F.Supp. 232 (S.D.N.Y. 1951), the court held that a deviation which involved calling at ports out of their geographical order to take advantage of spring tides, thereby speeding delivery times for the cargo overall, but which happened to delay the delivery of plaintiff's cargo was a reasonable deviation. The court described the test of reasonableness as "what departure from the contract voyage might a prudent person controlling the voyage at the time make and maintain, having in mind all the relevant circumstances existing at the time, including the terms of the contract and the interests of all parties concerned, without obligation to consider the interest of any one as conclusive." *Id.* at 237. Similarly, an examination of all of

---

**2.** Defendant's knowledgeable witness credibly stated that to service Houston to Pireaus would probably take longer under a non-relay delivery

system because the bulk of the cargo for numerous reasons would be delivered to the Northern and Western European ports first.

the relevant circumstances here, demonstrates that defendant's relay system was a reasonable method of delivering plaintiff's cargo in as expedient and efficient a manner as possible.

■ In sum, plaintiff has not established that the defendant unreasonably deviated from their contract of carriage. As such, the complaint is dismissed.[3]

SO ORDERED.

---

**3.** Defendant requests attorney's fees. Defendant has not established that plaintiffs' action was either brought in bad faith or in violation of Fed.R.Civ.P. 11 and hence, there are no grounds upon which to grant it attorney's fees. Accordingly, its request for such fees is denied.